MARY Beth Kelly, J.
This case requires that we determine whether to grant a writ of mandamus in favor of plaintiff, Stand Up For Democracy, to compel the Board of State Canvassers to certify plaintiffs referendum petition for inclusion on the November 2012 ballot. Intervening defendant, Citizens for Fiscal Responsibility, challenged the certification of plaintiffs referendum petition, alleging that it failed to comply *594 with the type-size requirement of MCL 168.482(2) and that the doctrine of substantial compliance, whereby technical deficiencies are resolved in favor of certification, did not apply. The Court of Appeals agreed with both assertions, but concluded it was required to follow its decision in Bloomfield Charter Township v Oakland County Clerk[1] and conclude that the petition substantially complied with the type-size requirement of MCL 168.482(2) and that certification was required. Consequently, the Court of Appeals directed the board to certify the petition.[2]
However, because MCL 168.482(2) uses the mandatory term “shall” and does not, by its plain terms, permit certification of deficient petitions with regard to form or content, a majority of this Court holds that the doctrine of substantial compliance is inapplicable to referendum petitions submitted for certification. Therefore, we reverse the Court of Appeals’ judgment in this regard and we overrule Bloomfield Charter Twp.
Three justices of this Court further conclude that the type-size requirement of MCL 168.482(2) requires that the “type,” not the “letters,” of the petition heading measure 14 points. Because the Court of Appeals held that plaintiff failed to actually comply with the type-size requirement of MCL 168.482(2) given that the letters did not measure 14 points, we would also have reversed that portion of the Court of Appeals’ judgment.
*595 Because a majority of this Court holds that a new writ of mandamus should enter directing the Board of State Canvassers to certify plaintiffs petition as sufficient, a majority of this Court directs the Board of State Canvassers to certify plaintiffs petition for the ballot. Pursuant to MCR 7.317(C)(3), we direct the Clerk of the Court to issue the judgment order forthwith.
I. FACTS AND PROCEDURAL HISTORY
On February 29, 2012, plaintiff filed its referendum petition to invoke a referendum with regard to 2011 PA 4, MCL 141.1501 et seq., the emergency financial manager law, and to request certification of the petition from the Board of State Canvassers.[3] The petition *596 contained 203,238 valid signatures, well exceeding the number necessary to certify the petition and to place the referendum on the November 2012 ballot. On March 14, 2012, plaintiff submitted its printer’s affidavit attesting that the petition heading was “PRINTED IN CAPITAL LETTERS IN 14-POINT BOLDFACE TYPE[.]”
On April 9, 2012, intervenor filed a challenge to the form of plaintiffs referendum petition, asserting, in part, that the heading, “REFERENDUM OF LEGISLATION PROPOSED BY INITIATIVE PETITION,” did not comply with the requirement of MCL 168.482(2) that the heading be “printed in capital letters in 14-point boldfaced type . .. .”
The Board of State Canvassers considered intervenor’s challenge on April 26, 2012. At the hearing, intervenor asserted that the form and content requirements of MCL 168.482(2) are mandatory. Intervenor submitted two affidavits of two printers who reviewed the petition and stated that the petition was deficient because its heading did not measure 14-point type. Plaintiff countered that the board should apply the doctrine of substantial compliance and approve the petition and, alternatively, that its petition actually complied with the type-size requirement of the statute. Plaintiff relied on its printer’s affidavit, as well as the expert testimony of two printers, in support of its argument. Plaintiff also criticized one of intervenor’s expert’s affidavits for simply measuring one of the capital letters in the heading.
At the close of the hearing, two members of the board voted in favor of a motion to certify the petition, reasoning that “there was more than substantial compliance, . . . there was total compliance.” The remaining two board members voted to deny the motion, believing *597 there to be a “legitimate question as to the size of the words” and reasoning that substantial compliance is insufficient under MCL 168.482(2) given its mandatory language. Consequently, the board did not approve the motion to certify the petition.
Plaintiff then filed a complaint for mandamus in the Court of Appeals, requesting the Court to order defendants, the Board of State Canvassers and the Secretary of State, to certify the petition for inclusion on the November 2012 ballot because the board had a clear legal duty to certify the petition, because plaintiff either substantially or actually complied with the 14-point-type statutory requirement. The Court of Appeals first ruled that “the Calibri font utilized in plaintiffs petition heading is smaller than the prescribed 14-point type measurement of 14/72 inches.”[4] Without defining the term “type,” the panel reasoned that “text that does not measure 14 point, or 14/72 inches, is insufficient under the statute.”[5] The Court of Appeals, however, concluded that it was bound to follow Bloomfield Charter Twp and concluded that plaintiffs petition had substantially complied with MCL 168.482(2).[6] The Court therefore granted plaintiffs complaint for a writ of mandamus, compelling inclusion of the referendum on the ballot.
We granted oral argument on the application for leave to appeal to consider “(1) whether plaintiff actually complied with the 14-point-type requirement in MCL 168.482(2), specifically given the terms ‘point’ and ‘type’; and (2) if not, whether substantial compliance with the 14-point-type requirement in MCL 168.482(2) is sufficient to give plaintiff a clear legal right to certification *598 of the petition.”[7] In lieu of granting leave to appeal, pursuant to MCR 7.302(H)(1) a majority of this Court concludes that the Court of Appeals’ judgment is reversed, that substantial compliance is insufficient to certify plaintiffs petitions, and we issue a writ of mandamus, directing the Board of State Canvassers to certify plaintiffs petition as sufficient.
II. STANDARD OF REVIEW
We review for an abuse of discretion a court’s decision to issue or deny a writ of mandamus.[8] This dispute also involves a question of statutory interpretation, which we review de novo.[9] “[O]ur primary task in construing a statute, is to discern and give effect to the intent of the Legislature.”[10] The words of the statute are the most reliable evidence of the Legislature’s intent and we must give each word its plain and ordinary meaning.[11] “In interpreting the statute at issue, we consider both the plain meaning of the critical word or phrase as well as ‘its placement and purpose in the statutory scheme.’ ”[12]
III. ANALYSIS
This appeal concerns a big constitutional issue, even though its focus is something as small as 14/72 of an *599 inch. This matter turns on what many citizens may regard as a trivial issue: Whether a heading on a petition signed by over 200,000 people satisfies the statutory requirement that the petition heading be in “14-point boldfaced type[.]”[13] As technical as this appears, the rule of law is implicated here because this issue concerns the constitutional foundation of how we govern ourselves.
Although we colloquially call ourselves a “democracy,” we are not. We are a constitutional republic in which we, as Michigan citizens, elect our representatives to local and state legislative bodies to enact our laws. This republican form of government is guaranteed to us in the United States Constitution.[14]
In Michigan, we have enacted into our State Constitution an exception: The right of the people by initiative or referendum directly to enact laws or to repeal those validly enacted by our Legislature.[15] Thus, as plaintiff seeks here, it is possible for a small minority of citizens to suspend a validly enacted law and require that that law be voted on in a general election. This case well demonstrates that tension between constitutional interests: the right to a republican form of government versus a constitutional process that allows a small minority to suspend the enactments of that government.
In the very constitutional provision creating this right of petition by initiative and referendum, the Legislature is required to prescribe the rules by which *600 such petitions may validly be made.[16] It has done so, and one such provision is the mandatory 14-point-boldfaced-type requirement that is challenged here.[17] No doubt in most ordinary circumstances whether a heading is in 14-point or 12-point type would be an inconsequential issue. But, because the power of referendum affects duly enacted laws, these so-called “trivial” requirements protect the citizens of Michigan from having their laws suspended by small factions— unless the petitioners satisfy all the requirements for invoking a referendum.[18] With these principles in mind, we turn to the statutory requirement that the petition heading “shall be . . . printed in capital letters in 14-point boldfaced type[.]”[19]
A. SUBSTANTIAL COMPLIANCE
Plaintiff first suggests that the statutory scheme allows for certification of a referendum petition if that petition substantially complies with MCL 168.482.[20] *601 The applicable statutory provision, MCL 168.482(2) provides:
If the measure to be submitted proposes a constitutional amendment, initiation of legislation, or referendum of legislation, the heading of each part of the petition shall be prepared in the following form and printed in capital letters in 14-point boldfaced type:
REFERENDUM OF LEGISLATION PROPOSED BY INITIATIVE PETITION[21]
The Legislature’s use of the term “shall” “ ‘indicates a mandatory and imperative directive.’ ”[22] Nowhere does the language of this provision indicate that compliance with the 14-point-type requirement may be achieved despite deficiencies. Indeed, other provisions of the Michigan Election Law, MCL 168.1 et seq., demonstrate that the Legislature knows how to construct language specifically permitting substantial compliance with regard to form and content requirements.[23] Similar lan *602 guage is conspicuously absent from MCL 168.482(2) and demonstrates a clear intent that petitions for referendums, voter initiatives, and constitutional amendments strictly comply with the form and content requirements of the statute. This conclusion is further supported by the Legislature’s 1965 amendment of MCL 168.482, which omitted language that specifically permitted substantial compliance but retained the mandatory requirement that the petition heading be in 14-point type.[24] Indeed, the use of the mandatory term “shall” in MCL 168.482(2), in the absence of any language indicating that substantial compliance with the statute’s requirements suffices, indicates a clear intent that such a petition must strictly comply with the type requirement. Consequently, substantial compliance with MCL 168.482(2) is not permitted. To certify a petition that does not strictly comply with the requirements of MCL 168.482 on the basis that it substantially complied with the statutory requirements would defeat the Legislature’s intent. However, “our judicial role precludes [us from] imposing different policy choices than those selected by the Legislature”; rather, we must apply the terms as written.[25]
Plaintiff, however, also relies on MCL 168.544d, which provides that petitions circulated countywide “shall be substantially as provided in [MCL 168.482]____” Plaintiff asserts that this provision adopts the substantial compli *603 anee doctrine and permits certification of nonconforming referendum petitions. Because plaintiff circulated its petition countywide, MCL 168.544d is applicable. That provision provides:
Nominating petitions for the offices under this act and petitions for a constitutional amendment, initiation of legislation, or referendum of legislation or a local proposal may be circulated on a countywide form. Petitions circulated countywide shall be on a form prescribed by the secretary of state, which form shall be substantially as provided in sections 482, 544a, or 544c, whichever is applicable. The secretary of state may provide for a petition form larger than 8-1/2 inches by 13 inches and shall provide for identification of the city or township in which the person signing the petition is registered. The certificate of the circulator may be on the reverse side of the petition. This section does not prohibit the circulation of petitions on another form prescribed by this act.
By its plain language, this provision permits the Secretary of State to prescribe a form that itself “substantially” complies with the requirements of MCL 168.482. Thus, to the extent that MCL 168.544d permits substantial compliance, it only permits the Secretary of State to prescribe petition requirements that are in substantial compliance with MCL 168.482, MCL 168.544a, or MCL 168.544c of the Michigan Election Law. Contrary to plaintiffs contention, the statute does not allow a petitioner itself to determine what substantially complies with the applicable election law requirements. The Legislature only provided the Secretary of State with that discretion.
More significantly, the Secretary of State’s prescribed form, as permitted by MCL 168.544d, mandates strict compliance with the Legislature’s mandate in MCL 168.482(2) that the heading of a referendum petition be *604 printed in 14-point type.[26] Accordingly, MCL 168.544d does not constitute a broad substantial compliance provision, as plaintiff would have us interpret it. Because the Secretary of State’s prescribed form mandates strict compliance with MCL 168.482(2), plaintiffs reliance on MCL 168.544d is unavailing.
In the absence of statutory language supporting the substantial compliance doctrine, plaintiff nevertheless posits that Michigan caselaw provides a general substantial compliance exception to the mandatory requirements of the Michigan Election Law. Plaintiff principally relies on Bloomfield Charter Twp for the proposition that Michigan courts have allowed issues to be placed on the ballot despite the existence of technical deficiencies in form and content. Although a lineage of Michigan Court of Appeals cases exists applying the substantial compliance doctrine before an election, we are unwilling to follow this line of cases and adopt a general substantial compliance exception because such a rule is inconsistent with the statutory scheme as well as our jurisprudence.[27]
*605 In Bloomfield Charter Twp,[28] a group of developers filed annexation petitions with the county clerk, who certified the petitions and scheduled a referendum election regarding annexation. The township sought to enjoin the election and also alleged, in part, that the annexation petitions failed to comply with MCL 168.488, which requires that annexation petitions meet the requirements of MCL 168.482(1) and (4) through (6). The circuit court denied the township’s request for injunctive relief and concluded that certification of the petitions was proper because “ ‘any technical deficiencies in the petitions are not material. . . .’ ”[29] Approximately a year later, after voters had approved the annexation, the Court of Appeals affirmed the circuit court’s ruling. The Court acknowledged that the annexation petitions were technically deficient under the statute, and reasoned that it would apply “the doctrine [of substantial compliance] in this case involving imperfect petitions, absent the Legislature’s instruction that a petitioned-for election will be precluded unless the initiating petitions exactly match the Michigan Election Law requirements for form and content.”[30] The Court, therefore, affirmed the circuit court and concluded that it had properly found substantial compliance and had correctly refused to permit the minor defects to preclude the election.[31]
*606 Bloomfield Charter Twp is overruled to the extent that it stands for the proposition that substantial compliance with mandatory petition requirements compels the pre-election certification of a technically deficient petition. Clearly, Bloomfield Charter Twp’s reasoning is contrary to the plain language of MCL 168.482(2), which we have explained contains a mandatory 14-point-type requirement. A nonconforming referendum petition cannot be certified for inclusion on the ballot because that result is contrary to the Legislature’s intent that petitions strictly conform to the requirements of MCL 168.482. Simply because the Legislature has not included an explicit instruction that “a technically imperfect petition necessarily precludes an election regarding the matter therein addressed,” does not mean that the Legislature intended inclusion of deficient petitions as Bloomfield Charter Twp reasoned.[32] Bloomfield Charter Twp inferred too much from the legislative silence and effectively ignored the mandatory language that the Legislature chose to use when stating the form and content requirements of MCL 168.482.
Moreover, while this Court has recognized application of the substantial compliance doctrine to mandatory petition requirements posi-election,[33] it has not recently sanctioned application of substantial compli *607 anee to nonconforming petitions before an election. The only Michigan Supreme Court case to apply the substantial compliance doctrine pre-election is Kadans v Wayne County Clerks.[34] In that case, the plaintiff sought a writ of mandamus compelling the defendant to certify his nonconforming nominating petitions. Fifty-eight of the plaintiffs fifty-nine petitions were not 8V2 by 13 inches as required by former MCL 168.544, but were 2V2 to 3 inches shorter than 13 inches because they were missing the circulator’s affidavit. This Court unanimously found that former MCL 168.544 had “been complied with by plaintiff according to the rule of ‘substantial compliance’ ” and that the plaintiff was entitled to the writ of mandamus.[35]
Kadans's broad application of the substantial compliance standard, however, was repudiated by the Legislature’s subsequent adoption of MCL 168.544d.[36] Before adoption of that provision, the law was silent with respect to agency-created or agency-prescribed petitions. The adoption of MCL 168.544d now provides clear guidance concerning when substantial compliance is allowed with regard to agency-created or agency-prescribed petitions and essentially delegates to the Secretary of State the ability (through its prescribed petitions) to determine what requirements must be fully complied with and what requirements need be only substantially complied with. Consequently, the only case from this Court applying a general substantial compliance exception to mandatory petition requirements of the Michigan Election Law has been superseded by statute.
*608 In sum, neither the statutory scheme nor the caselaw plaintiff relies on supports application of the substantial compliance doctrine in the period before an election. Rather, for substantial compliance to be sufficient before an election, its use must be rooted in a particular statutory exception to the statutory formatting and content requirements. Because no statutory provision permitting application of substantial compliance exists in the instant case, and because intervenor has raised a pre-election challenge, plaintiff must have actually complied with the requirements of MCL 168.482(2) in order for its referendum petition to be certified.[37]
B. ACTUAL COMPLIANCE
1. TYPE-SIZE REQUIREMENT OF MCL 168.482(2)
To determine whether plaintiff has actually complied with MCL 168.482(2), we must first determine the meaning of the phrase “printed in capital letters in 14-point boldfaced type[.]” The Michigan Election Law does not define the terms “point” and “type,” but the parties agree that the traditional definitions of “point” and “type” have not substantially changed since the enactment of the statute in 1954. We agree with the traditional definitions proposed because they are con *609 sistent with those terms’ acquired technical meanings[38] and those definitions have remained constant up to the present day. “Point” is defined as “a unit that is used to measure the size of type used in printing and that is equivalent to about Vv2 inch[.]”[39] “Type” is defined as “[a] rectangular block, usually of metal or wood, having its face so shaped as to produce, in printing, a letter, figure, or other character[.]”[40] Multiple dictionary depictions of type show that the character, or typeface, does not cover the entire surface of the type, but rather *610 includes spacing above or below the letters, to prevent the printed characters from touching.[41] These depictions further demonstrate that the point size of type measures the entire vertical face of the metal block. The significance of these definitions is that the character printed is smaller than the point size of the type.[42]
The parties’ views diverge, however, with respect to whether the phrase “printed in capital letters in 14-point boldfaced type” requires measurement of the “letters” or of the “type.” Intervenor, like the Court of Appeals, interprets the phrase to require that the “letters” measure 14 points. We disagree with this interpretation and conclude that the type must measure 14 points, not the resulting printed letters. This is because the technical definition of “point” specifically denotes that point measures type size, which is the entire vertical length of the printer’s block. As explained, the technical meanings of “point” and “type” necessarily incorporate some amount of blank space so that the capital letters in 14-point type do not necessarily measure 14/72 of an inch.
*611 Intervenor claims that because “in” means “made of,” the letters must measure 14 points. However, this argument is specious. The term “14-point” specifically modifies the word “type,” and there is no indication that the Legislature intended to diverge from the technical meanings of the terms “point” and “type.” Had the Legislature intended that the physical height of the letters measure 14 points, it would not have used the term “type” as modified by “14-point” and instead could have specified that the letters must “measure 14 points.”[43]
Furthermore, intervenor’s argument does not take into account the remaining subsections within MCL 168.482, which provide additional support for our conclusion. Subsection (3) states, “The full text of the amendment so proposed shall follow and be printed in 8-point type,” while subsection (5) states, “The following warning shall be printed in 12-point type. . . .” Reading these subsections together with subsection (2), and consistently as a whole as we must,[44] it is clear that *612 the point size of all the required text refers to the size of the type and not the individual letters. The fact that the other content requirements are not required to be in capital letters, but a combination of uppercase and lowercase letters, necessarily contemplates that letters in the required type size may have different heights, since a lowercase “x” has a different height than an uppercase “E.” This provides further support for the conclusion that the “type,” and not each individual “letter,” must be measured. Otherwise, if intervenor’s position were adopted, each of the letters in subsections (3) and (5) would have to be of equal physical size, contrary to the Legislature’s clear indication in subsections (3) and (5) that the required text appear in both uppercase and lowercase letters. Given the foregoing, it is clear that the reference to “letters” in MCL 168.482(2) is intended merely to clarify that the text of the heading appear in all capital letters.[45] We would therefore hold that MCL 168.482(2), by its plain terms, requires that the type of the petition heading measure 14 points, not the individual letters.
2. MEASUREMENT OF DIGITAL TYPE
Having concluded that the “type” of the petition heading and not the letters must measure 14-points, does not end the analysis. Rather, it must be deter *613 mined whether plaintiffs petition heading measures 14-point type. This question necessarily involves the preliminary issues whether the traditional meanings of “point” and “type” are transferrable to digital text and, if so, how digital 14-point type is to be measured.
While plaintiff and intervenor disagree on these points, the assistant attorneys general representing the Board of State Canvassers and the Secretary of State conceded at oral argument and in their supplemental brief concerning intervenor’s application for leave to appeal in this Court, that those “same [traditional] concepts [of point and type] are replicated in computer software programs that result in the production of digital type from an electronic printer.”[46] Counsel for the board and the Secretary of State has also conceded that the same methods of measurement applicable to metal blocks of type are applicable to digital type.[47] *614 Further, because this Court can take judicial notice of facts not subject to reasonable dispute,[48] I acknowledge that Microsoft’s glossary of typographical terms defines “point” consistently with that term’s traditional meaning, as “[a] unit of measurement, often used to measure type size, equal to 0.013837 inch (approximately equal to V72 [inch]).”[49] And although Microsoft’s glossary does not include the definition of “type,” it defines “font size” as the “size of type. . . .”[50] A separate Microsoft *615 webpage further indicates that, when measuring the point size of type, the letter does not cover the entire “block” because “a little bit [is] added on. .. so that lines of type ‘set solid’ (without any additional space between them) do not bash into each other.”[51]
Given the concessions made by counsel for the board and the Secretary of State’s and Microsoft’s definitions of point and type, it is clear that digital type is the equivalent of physical type and that computer software continues to use this basic terminology.[52] Further, because digital type and physical type are functional equivalents, they are measured in the same manner except in the instance of digital type; in that instance an invisible box, which replicates the printer’s block, is measured and is reflected by the font size selected.[53]
*616 3. APPLICATION
In the present case, plaintiff used 14-point Calibri font for its petition heading, as attested to by plaintiffs printer. Although plaintiffs printer’s affidavit did not state the basis for this conclusion, the affiant explained at the Board of State Canvassers hearing how he verified the point size:
When I was asked to sign the affidavit, I took the file that we were given, that we had assembled for printing purposes, and I used a program ... called PDF Suite. And I went in and I verified that it was 14-point....
Intervenor filed two competing affidavits, but did not present any expert testimony at the hearing. Both affiants measured the size of the petition heading’s capital letters and each concluded that the heading is in “a significantly smaller font than required” without providing a basis for this conclusion. I do not view these affidavits as dispositive because, as I have already concluded, measuring the letters to determine compliance with MCL 168.482(2) is an inappropriate method of measurement.
I also do not view as dispositive the intervenor’s supplemental affidavit submitted after we granted oral argument on the application.[54] In this affidavit, the affiant attested that, using an E-scale ruler,[55] the type of *617 the petition heading did not measure 14 points, and that while the E-scale ruler “subtracts] the space above or below the actual letter,” the E-scale ruler only reflects how characters of a particular font in 14-point type will appear. Because different fonts take up different amounts of space within the digital block, an E-scale ruler cannot definitively measure whether the actual font selected is in 14-point type.
I also find the affiant’s comparison of plaintiffs heading with 14-point type metal blocks that were available in 1954 to be unpersuasive. The affiant avers that this comparison shows that plaintiffs heading is “clearly a smaller type size,” yet the spacing between the lines of text in each of the three examples appears to be the same. This exercise only demonstrates what we already know: Different styles of font will take up different amounts of space on a printer’s metal or digital block. In fact, plaintiffs expert testified with regard to this very fact at the hearing:
Basically when you’re talking about 14-point type, you’re talking about an area that’s just less than a fifth of an inch, .194. And it becomes a canvas that a type designer gets to work with, and sometimes they use the whole canvas and sometimes they use part of the canvas.
Consequently, the affiant’s comparison does not establish that plaintiffs heading is noncompliant. Rather, because the spacing between the lines of each example of text appears to be equal, the comparison tends to demonstrate actual compliance with the 14-point-type requirement.
My review of intervenor’s evidence shows that intervenor failed to establish that plaintiffs petition’s heading was not in 14-point type and otherwise failed to create a legitimate question of fact regarding the type size used. Plaintiffs evidence established that its *618 printer used a 14-point Calibri font, which the printer verified using Adobe software, and which intervenor simply failed to rebut. Because Microsoft defines font size to equal type size, plaintiff presented evidence establishing that it actually complied with the type-size requirement of MCL 168.482(2). There being no evidence to the contrary, I conclude that plaintiff actually complied with MCL 168.482(2).
C. MANDAMUS
We must next determine whether plaintiff is entitled to a writ of mandamus requiring certification of the referendum petition. Mandamus is an extraordinary remedy and the primary purpose of a writ of mandamus is to enforce duties required by law.[56] To obtain a writ of mandamus the plaintiff must show that it has a clear legal right to the performance of the specific duty sought to be compelled and that the defendant has a clear legal duty to perform the act.[57]
The board’s duty with respect to referendum petitions is limited to determining the sufficiency of a petition’s form and content and whether there are sufficient signatures to warrant certification.[58] In this case, there is no question that plaintiff collected more than enough valid signatures in support of its petition. However, because the board deadlocked on the issue of compliance with the type-size requirement of MCL 168.482(2), the board did not certify the petition. Because plaintiffs petition actually complied with the type-size requirements of MCL 168.482(2), the board is *619 obligated to certify the petition. Accordingly, I conclude that plaintiff is entitled to a writ of mandamus because the board has a clear legal duty to certify the petition as actually compliant with MCL 168.482(2).
IV CONCLUSION
A majority of this Court holds that the doctrine of substantial compliance is inapplicable to referendum petitions submitted for pre-election certification and we overrule Bloomfield Twp. I and two other justices further conclude that the type-size requirement of MCL 168.482(2) requires that the “type,” not the “letters,” of the petition heading measure 14 points. I additionally conclude that plaintiff actually complied with the type-size requirement. Finally, a majority of this Court holds that plaintiff is entitled to a new writ of mandamus requiring the Board of State Canvassers to certify its petition as sufficient. Accordingly, a majority of this Court directs the Board of State Canvassers to certify plaintiffs petition for the ballot and, pursuant to MCR 7.317(C)(3), we direct the Clerk of the Court to issue the judgment order forthwith.
SUMMARY
(1) A majority of this Court holds that the Court of Appeals erred by granting mandamus on the basis of plaintiffs substantial compliance with election law. The Court of Appeals opinion and grant of mandamus are reversed. Substantial compliance with the requirements of MCL 168.482(2) is insufficient to establish that plaintiffs referendum petition is entitled to be placed on the ballot. Entitlement to be placed on the ballot requires a showing of actual compliance with the law.
*620 (2) The Board of State Canvassers shall certify the petition as sufficient because a majority of the Court concludes that plaintiff either actually complied with the law or that the Court of Appeals’ original writ of mandamus was not erroneous. Accordingly, a new writ of mandamus shall enter.

 Bloomfield. Charter Twp v Oakland Co Clerk, 253 Mich App 1; 654 NW2d 610 (2002).

 Stand Up For Democracy v Secretary of State, 297 Mich App 45; 824 NW2d 220 (2012). The Court of Appeals sought to convene a conflict panel, MCR 7.215(J)(2) and (3), but a majority of the Court declined to convene the panel in an order entered June 14, 2012. Stand Up For Democracy v Secretary of State, 297 Mich App 801 (2012).

 The people’s power of referendum is a constitutional right. Const 1963, art 2, § 9 provides, in relevant part:
The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted hy the legislature, called the referendum.... The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the... referendum, petitions signed by a number of registered electors, not less than ... five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.
No law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election.
Once the Board of State Canvassers makes its official declaration of the sufficiency of a referendum petition and certifies the petition, the law subject to the referendum is no longer effective. See MCL 168.477(2) (“[A] law that is the subject of the referendum continues to be effective until the referendum is properly invoked, which occurs when the board of state canvassers makes its official declaration of the sufficiency of the referendum petition.”).

 Stand Up For Democracy, 297 Mich App at 67.

 Id. at 67.

 Id. at 68.

 Stand Up For Democracy v Secretary of State, 491 Mich 950 (2012).

 Casco Twp v Secretary of State, 472 Mich 566, 571; 701 NW2d 102 (2005).

 People v Kolanek, 491 Mich 382, 393; 817 NW2d 528 (2012).

 Sun Valley Foods Co v Ward, 460 Mich 230, 236; 596 NW2d 119 (1999).

 Krohn v Home-Owners Ins Co, 490 Mich 145, 156; 802 NW2d 281 (2011).

 Sun Valley Foods Co, 460 Mich at 237, quoting Bailey v United States, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995).

 MCL 168.482(2).

 Article IV § 4 of the United States Constitution states: “The United States shall guarantee to every State in this Union a Republican Form of Government.. . .”

 Const 1963, art 2, § 9.

 Const 1963, art 2, § 9 (“The power of referendum . . . must be invoked in the manner prescribed by law . ...”).

 MCL 168.482(2).

 See Thompson v Secretary of State, 192 Mich 512, 522-523; 159 NW 65 (1916).

 MCL 168.482(2).

 The partial dissent of Justices Cavanagh, Marilyn Kelly, and Hathaway claims that it is “unnecessary,” post at 634, to rule on the issue of substantial compliance. However, the Court of Appeals treated this case as one involving substantial compliance and analyzed the doctrine in detail. Indeed, the basis for the Court of Appeals’ grant of mandamus was its conclusion that plaintiff had substantially complied with the type-size requirement of MCL 168.482(2). This Court, therefore, has the responsibility to obviate any doctrinal confusion regarding substantial compliance before analyzing the Court of Appeals’ ruling. Thus, the justices concluding that substantial compliance is insufficient are not reaching an “unnecessary” issue, but are instead correcting an error of law that pervaded the Court of Appeals’ decision and was essential to its ruling.

 Emphasis added.

 Mich Ed Ass’n v Secretary of State (On Rehearing), 489 Mich 194, 218; 801 NW2d 35 (2011), quoting Burton v Reed City Hosp Corp, 471 Mich 745, 752; 691 NW2d 424 (2005).

 See MCL 168.303(2) (the “nominating petition shall be substantially in the form prescribed in section 544c”); MCL 168.546 (“nominating petitions ... must comply substantially with the above form”); MCL 168.590a(l) (a “qualifying petition shall be ... in substantially the same form as provided in section 590h”); MCL 168.590h(2) (“the qualifying petition form shall be substantially as set forth in section 544c”); MCL 168.653a(1) (“notice [of a special election] shall be in substantially the following form”); MCL 168.685(3) (“[new political party] petitions shall be in substantially the following form”); MCL 168.697 (the “names of the several offices to be voted for shall be placed on the ballot substantially in the following order”); MCL 168.759(5) (an “absent voter ballot application shall be in substantially the following form”); MCL 168.761(4) (the “clerk shall enclose with the ballot... a printed statement in substan *602 tially the following form”); MCL 168.952a (“A person may print his or her own recall petitions if those petitions comply substantially with the form prescribed by the secretary of state and the requirements of section 544c(2).”).

 Compare MCL 168.482, as amended by 1954 PA 116 (which included the phrase “type of the approximate size set forth”), with MCL 168.482, as amended by 1965 PA 312 (which omitted that phrase).

 People v McIntire, 461 Mich 147, 152; 599 NW2d 102 (1999) (quotation marks and citation omitted).

 See Memorandum from the Secretary of State, Initiative and Referendum Petitions — Prescribed Format (Revised June 2011). The Secretary of State’s prescribed format requires that a referendum petition’s heading “shall be printed in capital letters in 14-point boldface type on the left margin of the signature side of the sheet or at the top of the signature side of the sheet.” Id. Clearly, the Secretary of State has not relaxed the type-size requirement of MCL 168.482(2).

 Notably, our caselaw has consistently recognized the availability of substantial compliance if a petition is challenged in the post-election context. See footnote 33 of this opinion. Court of Appeals jurisprudence, however, has ignored the significance of the distinction between preelection and post-election petition challenge cases. For example, in Settles v Detroit City Clerk, 169 Mich App 797; 427 NW2d 188 (1988), a pre-election challenge to an initiative petition in a home rule city, the Court cited post-election caselaw to hold that “all doubts as to technical deficiencies or failure to comply with the exact letter of procedural requirements in petitions .. . are resolved in favor of permitting the *605 people to vote and express a choice on any proposal subject to election.” Id. at 802-803, citing Meridian Charter Twp v East Lansing, 101 Mich App 805; 300 NW2d 703 (1980). Likewise in Bloomfield Charter Twp, technically a post-election case, the Court cited cases involving both pre- and post-election challenges for the same proposition, citing both Meridian Charter Twp and Settles.

 Bloomfield Charter Twp, 253 Mich App 1.

 Id. at 18.

 Id. at 23.

 Id. at 25.

 Id. at 22.

 It has long been held that post-election challenges substantially relax technical requirements on the grounds that any technical deficiencies are cured by the voters’ affirmative approval of the underlying proposal. See Carman v Secretary of State, 384 Mich 443, 454-455; 185 NW2d 1 (1971) (reasoning that the error in noncompliant initiatory petitions was cured by voters’ adoption of the constitutional amendment because they were “directly notified” of the omitted information on election day); City of Jackson v Commissioner of Revenue, 316 Mich 694, 716-718; 26 NW2d 569 (1947) (noting that courts should view technical errors differently once the electors have voted affirmatively).

 Kadans v Wayne Co Clerk, 363 Mich 306; 109 NW2d 788 (1961).

 Id. at 308.

 1975 PA 327.

 The partial dissent of Justices Cavanagh, Marilyn Kelly, and Hathaway asserts that “there are four votes that find at least substantial compliance ...Post at 634. This assertion is simply untrue. Rather, there are four votes for the elimination of the judicial expansion of the substantial compliance doctrine, and the partial dissent has refused to recognize that we have now eliminated this judicially created doctrine. Accordingly, when a petition is challenged pre-election, the petition must actually comply with the statutory mandates of MCL 168.482(2), or the petition must substantially comply pursuant to a specific statutory exception or through a form prescribed by the Secretary of State. Neither of the latter two circumstances exists in this case.

 MCL 8.3a.

 Webster’s Third New International Dictionary of the English Language, Unabridged Edition (1965), p 1750. The definition of “point system” before the enactment of the statute refers to substantially the same unit of measurement used to measure type. See Webster’s New International Dictionary of the English Language, Second Edition Unabridged (1948), p 1904 (“A system according to which the various sizes of type bodies, leads, etc., bear a fixed and simple relation to one another. The point system now in general use in America was adopted in 1886 by the United States Type Founders’ Association, though many founders were already using it. It is a modification of a French system, and is based upon the pica body then most used. This body is divided into twelfths, called “points,” and every type body consists of a given number of these points; as, the body of this book is printed in 6-point. The value of the point is .013837 inch, or nearly Vre inch. For specimens of sizes, see TYPE.”).

 Webster’s New International Dictionary of the English Language, Second Edition Unabridged (1948), p 2750. “Type” is also defined as “Such blocks, or the letters or characters impressed, collectively.” Id. Notably, Justice Markman prefers this definition, but he does not faithfully adhere to it because he omits the definition’s reference to “blocks.” Further, despite the parties’ agreement regarding the technical meanings of these terms, Justice Markman nonetheless asserts that because other methods of printing were available in 1954, that it is more reasonable to interpret “type” as the text or type produced. We reject Justice Markman’s preferred definition of “type” based on the availability of other printing methods for the well-explained reasons articulated by Chief Justice Young. These other printing methods are simply irrelevant because to ascertain the Legislature’s intent we must focus on the language used, not extraneous then-available printing methods. Indeed, the meanings of “point” and “type” were well established in 1954, and had the *610 Legislature intended some other unit of measurement to take account of these other printing methods, the Legislature could have said so, but it did not.

 See Webster’s Third New International Dictionary of the English Language, Unabridged Edition (1965), p 2476 (diagram of “type”); Webster’s New International Dictionary of the English Language, Second Edition Unabridged (1948), p 2750 (diagram of “type”).

 Furthermore, the definition of “point” refers to “type used in printing,” Webster’s Third New International Dictionary of the English Language, Unabridged Edition (1965), p 1750, and the definition of “point system” refers to the “sizes of type bodies,” Webster’s New International Dictionary of the English Language, Second Edition Unabridged (1948), p 1904. These references to “type” within the definition of “point” further support the conclusion that, whether the “type” refers to the printer’s blocks themselves, or whether it refers to the alternative definition of the resulting printed letters, the point measurement of type exists by reference to the actual printer’s blocks, contrary to Justice Markman’s claim.

 Having considered this textual argument, which is substantially the same as that offered by Justice Markman, his contention that we have not considered this language is clearly incorrect. Rather, it is Justice Markman who has failed to consider the phrase, “printed in capital letters in 14-point boldfaced type,” in the context of the entire section as we explain in footnote 44 of this opinion.

 “[W]ords and phrases used in an act should be read in context with the entire act and assigned such meanings as to harmonize with the act as a whole.” People v Couzens, 480 Mich 240, 249; 747 NW2d 849 (2008) (quotation marks and citation omitted). Yet, Justice Markman, like intervenor, reads MCL 168.482(2) in isolation to conclude that “type” must refer to the point size of the letters. Were we to adopt intervenor’s and Justice Markman’s position, we would essentially adopt two different definitions of type, requiring petitioners to measure the letters under MCL 168.482(2), but measure the type under MCL 168.482(3) and (5). Indeed, Justice Markman does not explain how to reconcile the language of MCL 168.483(2) with that used in subsections (3) and (5). Instead, he posits that the language of MCL 168.482(2), specifically the terms “printed” and “letters,” and “in” instead of “with,” evince a clear intent that the letters *612 measure 14 points and not the type. This view is unpersuasive for reasons I, and Chief Justice Young, have explained in detail.

 We disagree with intervenor’s and Justice Markman’s suggestion that the letter must be measured because otherwise, an illegible 3-point letter in 14-point type would comply with the statute. Intervenor, like Justice Markman, thus asserts that measurement of the type would defeat the purpose of MCL 168.482(2). This situation is not before this Court. Moreover, simply because the size of letters could be manipulated within a 14-point-type setting does not mean that the Legislature intended that the heading’s letters each measure 14 points.

 At oral argument, the assistant attorney general representing the board and the Secretary of State stated, ‘‘[Essentially software of the digital age is intended to replicate what was done in the past.”
Further, although this Court construes the statutory language “in the light of the circumstances existing at the date of [the statute’s] enactment, not in the light of subsequent developments” Wayne Co Bd of Rd Comm’rs v Wayne Co Clerk, 293 Mich 229, 235-236; 291 NW 879 (1940), I view the Legislature’s decision not to amend these technical terms, despite several amendments in the digital age, see 1993 PA 137 and 1998 PA 142, as an acknowledgement that the meaning of those terms has carried over to computerized printing.

 With regard to the measurement of type, the assistant attorney general at oral argument answered, “That’s my understanding,” in response to Chief Justice Young’s inquiry whether “even though we now have a different method of producing type, ... has that measurement [from the traditional printing industry] been faithfully transcribed into digitized forms of type?” Curiously, neither Chief Justice Young nor Justice Markman attaches any significance to defendants’ concessions, despite the fact that the Board of State Canvassers and the Secretary of State are charged with implementing Michigan’s election laws, including the *614 approval or denial of referendum, petitions and are, thus, in the best position to provide expertise regarding the proper measurement of digital text.

 People v Goecke, 457 Mich 442, 448 n 2; 579 NW2d 868 (1998) (noting that this Court may take judicial notice of facts not subject to reasonable dispute); MRE 201.

 Microsoft Support, WD2000: Definitions of Typography Terms in Word <http://support.microsoft.com/kb/192973/en-us> (accessed August 1, 2012).

 Id. Chief Justice Young asserts that judicial notice cannot be taken of how Microsoft “programmed its font system ... .” Post at 630 n 13. Yet, I have not taken judicial notice of such facts and have only taken judicial notice of terms specifically defined by Microsoft. That Microsoft has adopted certain definitions of “point,” and “font size,” and acknowledged that the point size of “type” measures not the letter but the digital block, is hardly subject to dispute. I fail to see how my acknowledgment of Microsoft’s definitions of these terms, made known to the public, is any different from this Court’s decisions to take judicial notice of economic conditions, In re Baldwin’s Estate, 311 Mich 288, 312; 18 NW2d 827 (1945), common human behaviors, Moore v Capital Nat’l Bank of Lansing, 274 Mich 56, 66-67; 264 NW 288 (1936), or an agency’s decision to change an historical practice, Grandville Muni Executive Ass’n v City of Grandville, 453 Mich 428, 442; 553 NW2d 917 (1996), or, indeed, this Court’s common practice of relying on dictionary definitions when interpreting a statute.
Justice Makkman also attempts to discredit my use of judicial notice, asserting that I have assumed that Microsoft defines type as font size. His assertion that there is “no evidence” to reach this conclusion, post at 646, is unfounded because, as I explain, Microsoft has specifically acknowledged that the size of type incorporates additional space not covered by the font, or actual letter.

 Microsoft, The Relationship Between Font Size and Physical Type Size <http://www.microsoft.com/typography/web/designer/face3.htm> (accessed August 1, 2012). Consistently with Microsoft’s recognition that digitized type is larger than the actual character, other modern typographical sources recognize that computer characters are contained within an invisible box, or blocking around the letter, which replicates the metal block used in mechanical typesetting. See Ambrose & Harris, The Fundamentals of Typography (2d ed) (Lausanne: AVA Publishing SA, 2011), p 46; Bringhurst, The Elements of Typographic Style (Vancouver: Hartley & Marks, 1992), p 289. Notably, just like the characters on physical type, the digital characters within digital type will take up different amounts of space within the type depending on the font family. See Craig, Scala, & Bevington, Designing with Type: The Essential Guide to Typography (5th ed) (New York: Watson-Guptill Publications, 2006), pp 17-18. This is why different fonts of different point, or font size, appear smaller or larger in comparison to one another. This is yet another reason why measurement of the digital letter will yield an inaccurate type size.

 Aside from the concessions and Microsoft’s definitions, multiple modern typographical sources also support this conclusion. Ambrose, The Fundamentals of Typography, p 46; Craig, Designing with Type, pp 17-18.

 This conclusion is implicit in Microsoft’s adoption of the technical term “point” and its acknowledgment that digital type is the equivalent of metal type. Adobe also acknowledges that measurement for metal type *616 is used for the measurement of digital type. Adobe, Measuring Type <http://www.adobe.com/type/topics/info2.html> (accessed August 1, 2012).

 After intervenor moved for leave to appeal and we granted argument on the application, this Court granted intervenor’s motion to supplement the record. Stand Up For Democracy v Secretary of State, 817 NW2d 50 (Mich, 2012).

 An E-scale ruler reprints various letters “E” of the same font family that comprise different type sizes to provide a side-by-side comparison between the example type size and the printed letter.

 State Bd of Ed v Houghton Lake Community Sch, 430 Mich 658, 666-667; 425 NW2d 80 (1988).

 In re MCI Telecom Complaint, 460 Mich 396, 442-443; 596 NW2d 164 (1999).

 See MCL 168.476 and MCL 168.477.