# STATE OF MICHIGAN

# COURT OF APPEALS

CITIZENS PROTECTING MICHIGAN'S
CONSTITUTION, JOSEPH SPYKE, and
JEANNE DAUNT,

        Plaintiffs,

v

SECRETARY OF STATE and MICHIGAN
BOARD OF STATE CANVASSERS,

        Defendants/Cross-Defendants,

and

VOTERS NOT POLITICIANS BALLOT
COMMITTEE, doing business as VOTERS NOT
POLITICIANS; COUNT MI VOTE, doing
business as VOTERS NOT POLITICIANS;
KATHRYN A. FAHEY; WILLIAM R. BOBIER;
and DAVIA C. DOWNEY;

        Intervening Defendants/Cross-
        Plaintiffs.

FOR PUBLICATION
June 7, 2018
9:15 a.m.

No. 343517

Before: CAVANAGH, P.J., and K. F. KELLY and FORT HOOD, JJ.

PER CURIAM.

Plaintiffs Citizens Protecting Michigan's Constitution (CPMC), Joseph Spyke, and Jeanne Daunt seek a writ of mandamus that orders defendants Secretary of State (Secretary) and the Board of State Canvassers (the Board) to reject an initiative petition filed by Voters Not Politicians concerning the forming of an independent citizen commission regarding redistricting and to not place it on the 2018 general election ballot. Intervening defendants Voters Not Politicians Ballot Committee and Count MI Vote, both doing business as Voters Not Politicians (VNP), Kathryn A. Fahey, William R. Bobier, and Davia C. Downey filed a cross-complaint, asking this Court to direct defendants to immediately execute their clear legal duties regarding the initiative petition. We deny the relief sought in the complaint for a writ of mandamus and grant the cross-complaint.

-1-

## I. FACTS AND PROCEDURAL HISTORY

### A. THE PARTIES

Plaintiff CPMC is a ballot question committee. Plaintiff Spyke is a qualified elector registered to vote in Ingham County and is a former paid employee of a political candidate. Plaintiff Daunt, a qualified elector registered to vote in Genesee County, is the parent of a person otherwise disqualified from serving on the proposed commission.

Defendant Secretary is the chief election officer of the state and has supervisory authority over local election officials. MCL 168.21. See also Const 1963, art 5, § 3. Defendant Board is a constitutionally created board; Const 1963, art 2, § 7. Its duties are established by law; MCL 168.22(2) and MCL 168.841. It canvasses initiative petitions to determine if the requisite number of qualified and registered electors has signed the petition. It makes the final decision regarding the sufficiency of the petition. MCL 168.476.

Intervening defendant VNP is a ballot question committee. Intervening defendant Fahey, a qualified elector registered to vote within Kent County, is the founder of VNP and serves as treasurer. Intervening defendant Bobier, who signed the VNP petition, is a qualified elector registered to vote within Oceana County and a former elected member of the Michigan House of Representatives. Intervening defendant Downey, who signed the VNP petition, is a qualified elector registered to vote within Ingham County.

### B. THE INITIATIVE PETITION

On June 28, 2017, intervening defendant VNP Ballot Committee filed an initiative petition for the ballot proposal with the Secretary as required by MCL 168.471.[1] After staff at the Bureau of Elections initially refused to recommend that the petition be approved, VNP redrafted the proposal to further address issues of abrogation and alteration. The Board approved the form of the petition on August 17, 2017, noting that its approval did not extend to the substance of the proposal, the substance of the summary of the proposal, the manner in which the proposal language is affixed to the petition, or whether the petition properly characterizes those provisions of the Constitution that have been altered or abrogated.

On December 18, 2017, VNP submitted the initiative petition supported by over 425,000 signatures[2] of registered voters for an amendment to the constitution to be placed on the November 2018 general election ballot. Primarily the VNP Proposal would amend Article 4, § 6 of Michigan's 1963 Constitution regarding the commission on legislative redistricting by changing the composition of the commission and its administration.[3] A new independent citizen

---

[1] That statute provides, in pertinent part: "Petitions under section 2 of article XII of the state constitution of 1963 proposing an amendment to the constitution shall be filed with the secretary of state at least 120 days before the election at which the proposed amendment is to be voted upon."

[2] According to the Secretary and the Board, only 315,654 signatures were needed.

[3] On the initiative petition, the proposal is summarized as follows, in pertinent part: "A proposal to amend the Michigan Constitution to create an Independent Citizens Redistricting Commission.

commission would have exclusive authority to develop and establish redistricting plans for the senate, house and congressional districts.

To prevent the VNP Proposal from appearing on the ballot, and before the Board could certify the petition as sufficient or insufficient, counsel for CPMC sent a letter to the Secretary, urging her to reject the VNP Proposal on the ground that it should not be submitted to voters because it was massive and would enact sweeping changes to the constitution. CPMC contended that it was a general revision to the constitution and thus could not be accomplished by ballot initiative. Further, the VNP Proposal purportedly omitted multiple sections of the constitution that would be abrogated by the proposal. CPMC asserted that the Secretary had a clear legal duty to reject the petition.

Counsel for VNP then sent a letter to the Board, requesting that it certify the VNP Proposal for the November 2018 general election ballot. VNP observed that no challenges to the 428,587 signatures had been filed by the deadline. Further, two separate entities had analyzed the sampled signatures and determined that 466 out of 505 sample signatures were valid, thereby confirming that a sufficient number of signatures support the proposal. VNP indicated that the instant suit by CPMC was irrelevant to the Board's clear legal duty to certify the VNP Proposal.

On May 22, 2018, the Bureau of Elections released its staff report pursuant to MCL 168.476(3). In it, the Bureau staff recommended that the Board certify the petition.

After plaintiffs filed the instant complaint for mandamus, intervening defendants moved to intervene. This Court granted the motion to intervene and accepted the cross-complaint filed by intervening defendants. *Citizens Protecting Michigan's Constitution v Secretary of State,* unpublished order of the Court of Appeals, entered May 11, 2018 (Docket No. 343517).

The Board notes that it must complete its canvass of VNP's petition at least two months before the November 2018 general election. Const 1963, art 12, § 2; MCL 168.476(2); MCL 168.477(1). Also, the Director of Elections also must prepare a statement of not more than 100 words for placement on the ballot. MCL 168.32(2).


C. BACKGROUND

VNP asserts that its proposal is "a desired means to remedy the widely-perceived abuses associated with partisan 'gerrymandering'[4] of state legislative and congressional election

_____

If adopted, this amendment would transfer the authority to draw Congressional and State Legislative district lines from the Legislature and the Governor to the Independent Commission. The selection process will be administered by the Secretary of State. Thirteen commissioners will be randomly selected from a pool of registered voters, and consist of four members who self-identity with each of the two major political parties, and five non-affiliated, independent members. Current and former partisan elected officials, lobbyists, party officers and their employees are not eligible to serve. . . ."

[4] The term "gerrymander" is a portmanteau of the name of Elbridge Gerry, a signer of the Declaration of Independence, fifth Vice President of the United States, and the eighth Governor

districts by the establishment of new constitutionally-mandated procedures designed to ensure that the redistricting process can no longer be dominated by one political party." More than a century ago, Justice Morse of our Supreme Court warned of the "greatest danger to our free institutions" where a political party retains its political power by dividing election districts in a manner to give special advantages to one group:

> By this system of gerrymandering, if permitted, a political party may control for years the government, against the wishes, protests, and votes of a majority of the people of the State, each Legislature, chosen by such means, perpetuating its political power by like legislation from one apportionment to another. [*Giddings v Secretary of State*, 93 Mich 1, 13; 52 NW 944 (1892), MORSE, C.J., concurring.][5]

Ninety years later, our Supreme Court commented that, "[i]n many states, the most egregious gerrymandering is practiced by the Legislature with the aid of computers to achieve results which will pass must under federal standards yet favor the partisan interests of the dominant political faction." *In re Apportionment of State Legislature—1982,* 413 Mich 96, 137; 321 NW2d 565 (1982). In short, "[i]t is axiomatic that apportionment is of overwhelming importance to the political parties." *In re Apportionment of State Legislature—1992,* 439 Mich 715, 716; 486 NW2d 639 (1992). Or, as Senator John Cornyn of Texas once said, "You can't take the politics out of politics, and there is nothing more political than redistricting."[6]

We are not alone in analyzing redistricting issues. Challenges to alleged unconstitutional partisan gerrymandering are pending before the United States Supreme Court in two cases.[7] Further, suit has been brought in the United States District Court, Eastern District of Michigan, to contest Michigan's existing apportionment plan.[8]

In the United States, a minority of states employ a nonpartisan independent mechanism for the drawing of legislative districts.[9] In most of the remaining states, including Michigan, whichever party is in control of the state Legislature draws the districts.[10]

---

of Massachusetts, known for designing legislative districts in strange shapes, one of which resembled a salamander. *Arizona State Legislature v Arizona Independent Redistricting Comm,* __ US ___; 135 S Ct 2652, 2658 n 1; 192 L Ed 2d 704 (2015).

[5] Justice McGrath concurred with his brethren justices and added with regard to gerrymandering that "[t]he greatest danger to the Republic is not from ignorance, but from machinations to defeat the expression of the popular will." *Id.* at 13-14 (MCGRATH, J., concurring).

[6] Aarab and Regnier, *Mapping the Treasure State: What States Can Learn from Redistricting in Montana,* Montana Law Review, 76 Mont L Rev 257 (2015) (citation omitted). <http://www.montanalawreview.org/mont-l-rev/mapping-the-treasure-state-what-states-can-learn-from-redistricting-in-montana> (accessed May 25, 2018).

[7] *Gill v Whitford,* No. 16-1161 (Wisconsin), and *Benisek v Lamone*, No. 17-333 (Maryland).

[8] *League of Women Voters of Michigan v Secretary of State,* No. 17-14148 (WestLaw 6610622).

[9] See *All About Redistricting,* Prof. Justin Levitt, Loyola Law School, <http://redistricting.lls.edu/who.php> (accessed May 24, 2018) and National Conference of State

## D. THE 1963 CONSTITUTION—REDISTRICTING

Under the 1963 Michigan constitution, the 38 members of Michigan's senate and the 110 members of the house of representatives are elected according to the district in which they reside. The constitution sets forth the apportionment factors and rules for individual districts, which are redrawn after the publication of the total population within the federal decennial census. Const 1963, art 4.

The apportionment of districts for representatives and senators is not a recent phenomenon, as the Michigan Constitution of 1835 addressed apportionment[11] and set forth parameters for representative districting[12] and for senate districts.[13] Fifteen years later, Article 4 was revised to provide for the division of a county into representative districts, when necessary, by board of supervisors.[14] The 1908 Constitution continued the division of counties into districts by a board of supervisors.[15] In the general election in 1952, the voters passed Proposition 3, which amended Articles 2-4 of § 5 of the 1908 Constitution to establish senate districts with geographic boundaries that were not subject to alteration based on a population change.[16] After

---

Legislatures, *Redistricting Law 2010,* pp 161-162, <http://www.ncsl.org/Portals/1/Documents/Redistricting/Redistricting_2010.pdf> (accessed May 25, 2018).

[10] See previous footnote*, All About Redistricting*.

[11] Const 1835, art 4, § 4 provided, in pertinent part, that the Legislature "shall apportion anew the representatives and senators among the several counties and districts, according to the number of white inhabitants."

[12] Const 1835, art 4, § 4 provided in part that representatives were to be chosen "by the electors of the several counties or districts into which the State shall be divided for that purpose." That section added that there would be one representative for each organized county, "but no county hereafter organized shall be entitled to a separate representative until it shall have attained a population equal to the ratio of representation hereafter established."

[13] Const 1835, art 4, § 6 provided: "The State shall be divided, at each new apportionment, into a number of not less than four nor more than eight senatorial districts, to be always composed on contiguous territory; so that each district shall elect an equal number of senators annually, as nearly as may be: and no county shall be divided in the formation of such districts."

[14] Const 1850, art 4, § 3 provided that representative districts should have "as nearly as may be an equal number of inhabitants," and further provided, in pertinent part: "In every county entitled to more than one representative, the board of supervisors shall assemble at such time and place as the legislature shall prescribe, and divide the same into representative districts, equal to the number of representatives to which such county is entitled by law . . . ."

[15] Const 1908, art 4, § 3 provided in pertinent part that "[i]n every county entitled to more than one representative, the board of supervisors shall assemble at such time and place as shall be prescribed by law, divide the same into representative districts equal to the number of representatives to which such county is entitled by law . . . ."

[16] In 1960, an elector brought a mandamus action to prevent the Secretary of State from performing acts related to the senate districting, alleging that the 1952 amendments were violative of equal protection. Our Supreme Court dismissed the action and the United States Supreme Court remanded. See *Scholle v Secretary of State*, 360 Mich 1; 104 NW2d 63 (1960), vacated and remanded sub nom, *Scholle v Hare*, 369 US 429 (1962). On remand, our Supreme

the 1961 Constitutional Convention, the 1963 Constitution called for districts to be apportioned under a weighted formula based on land area and population.

Under the current constitution, senate districts are aligned with Michigan's counties, each of which is assigned an apportionment factor of the state's population, based on the census, multiplied by four and the county's percentage of the total land area. Const 1963, art 4, § 2. The constitution also sets forth particular rules for the dividing of the state into senatorial districts. Const 1963, art 4, § 2.

House districts are defined by representative areas that "shall consist of compact and convenient territory contiguous by land." Const 1963, art 4, § 3. The districts also are defined by county and based on population. Const 1963, art 4, § 3.

After one representative is assigned to each representative area as defined above, the remaining house seats are apportioned on the basis of population. Const 1963, art 4, § 3. Counties that are entitled to two or more representatives are divided into single member districts, which are created based on population and which, if possible, should follow city and township boundaries and "be composed of compact and contiguous territory as nearly square in shape as possible." Const 1963, art 4, § 3. Representative areas that contain more than one county, and are entitled to more than one representative, are divided into single member districts, which adhere to county lines and are as equal as possible in population.[17] Const 1963, art 4, § 3.

Thus, over half a century ago, the Constitution of 1963 established criteria and procedures to appoint a commission to decide the apportionment of legislative districts for the senate and house of representatives. Const 1963, art 4, § 6; *In re Apportionment of Legislature— 1972,* 387 Mich 442, 450; 197 NW2d 249 (1972) ("The people in adopting the 1963 State Constitution, provided the procedure to carry out legislative reapportionment."). The constitution provided for an eight-member commission whose purpose was to "district and apportion the senate and house of representatives according to the provisions of this constitution." Const 1963, art 4, § 6, ¶ 5. A new commission would be appointed whenever the constitution requires apportionment or districting. Const 1963, art 4, § 6, ¶ 3. Four members were selected by the state organizations of the Democratic and Republican parties.[18] Const 1963, art 4, § 6, ¶ 1. The state political organizations also selected a resident from four specific regions, including the upper peninsula and three portions of the lower peninsula—the north, the southwest and the southeast. Const 1963, art 4, § 6, ¶ 1. With two exceptions, commission members could not be officers or employees of government and could not serve in the Legislature for two years after the apportionment in which they participated became effective.

---

Court decided that the amendments concerning senate districts were invalid. *Scholle v Secretary of State (On Remand )*, 367 Mich 176; 116 NW2d 350 (1962).

[17] The constitution also provides for procedures for territory that is annexed or merged with a city between apportionments. Const 1963, art 4, § 4. Islands also are taken into account. Const 1963, art 4, § 5.

[18] If a third political party offered a candidate for governor who received over 25% of the gubernatorial vote, the commission would increase to 12 members, with four chosen from the third political party's state organization. Const 1963, art 4, § 6, ¶ 1.

Const 1963, art 4, § 6, ¶ 2. Members held office until the apportionment they worked on became operative. Const 1963, art 4, § 6.

When a majority of the commission could not agree on redistricting, the members could submit a proposed plan to our Supreme Court. Const 1963, art 4, § 6, ¶ 7. The Supreme Court "shall determine which plan complies most accurately with the constitutional requirements and shall direct that it be adopted by the commission and publish as provided in this section." Const 1963, art 4, § 6, ¶ 7.[19]

Since the commission's inception, the apportionment of legislative districts has not been without conflict, causing our Supreme Court to preside over apportionment issues on several occasions. Or, as stated by Justice Brennan:

> The constitution creates a Commission on Legislative Apportionment. Four members are Republicans, four members are Democrats. Every ten years the Commission meets. Every ten years the Commission is unable to agree. [*In re Apportionment of Legislature—1972,* 387 Mich at 459, BRENNAN, J., dissenting.]

The very first commission after the adoption of the 1963 Constitution illustrates Justice Brennan's point. In May 1964, our Supreme Court directed the commission to adopt a particular plan when the commissioners could not agree. *In re Apportionment of State Legislature—1964,* 372 Mich 418, 480; 126 NW2d 731 (1964). The United States Supreme Court then issued *Reynolds v Sims,* 377 US 553; 84 S Ct 1362; 12 L Ed 2d 506 (1964), ruling that the weighted land area/population formulae rules violated the Equal Protection Clause of the United States Constitution. The Court indicated that the states should "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Id.* at 577.

Our Supreme Court then ordered the commission to adopt a different plan, the Austin-Kleiner plan, because it more closely aligned with *Reynolds* in that its districts contained population as nearly equal as practicable. *In re Apportionment of State Legislature—1964,* 373 Mich 247; 128 NW2d 721 (1964). An elector then challenged the Austin-Kleiner plan and again the commission could not agree, so again our Supreme Court was called upon. *In re Apportionment of State Legislature—1965-1966,* 377 Mich 396, 474; 140 NW2d 436 (1966). The Court ultimately dismissed the challenge, but not before Justice Black suggested that the eight commissioners' names be placed in a jury box, seven of them chosen at random, and those seven be directed to apportion the districts.[20] *Id.* at 413.

---

[19] The Supreme Court also has original jurisdiction over an elector's application filed within 60 days of the final publication of the plan. The Court may direct the secretary of state or the commission to perform their duties, review any final plan adopted by the commissioners and "shall remand such plan to the commission for further action if it fails to comply with the requirements of this constitution." Const 1963, art 4, § 6, ¶ 8.

[20] Perhaps that suggested procedure could be considered somewhat of a precursor to the VNP Proposal of randomly drawing candidates for the commission.

In 1972, after the Commission on Legislative Apportionment failed to settle on a plan,[21] the apportionment issue again was before our Supreme Court, which decided that the Hatcher-Kleiner plan most closely complied with the constitutional requirements, without addressing the constitutionality of the requirements themselves. *In re Apportionment of State Legislature—1972,* 387 Mich at 458.

Ten years later, our Supreme Court examined whether the commission's authority continued despite the holding from the United States Supreme Court that the apportionment rules are unconstitutional and, if so, what standards governed. The Court held that *Reynolds* invalidated the weighted land area/population formulae and the remaining apportionment rules in Article 4 were "inextricably interdependent" and thus were not severable. Likewise, the commission's functions, and the commission itself, were dependent on the rules and could not be severed. *In re Apportionment of State Legislature—1982,* 413 Mich at 116. The Court added that "[t]he matter should be returned to the political process in a manner which highlights rather than hides the choices the people should make." *Id.* at 138.

Thereafter, rather than relying on a commission, which was held to be inextricably related to the apportionment formulae negated by the United States Supreme Court, the Michigan Supreme Court appointed Bernard J. Apol, former Director of Elections, to produce maps to conform with the pertinent apportionment rules.[22] In 1982, the Court adopted Apol's plan. *In re Apportionment of State Legislature—1982,* 413 Mich 146; 321 NW2d 584 (1982).

Almost 10 years later, in a statement reflecting upon the 1982 decision, Justice Levin indicated that the people were to have adopted new apportionment rules:

> Another assumption of the compromise [within the 1982 decision] was that responsible persons would come forth and place on the ballot, and the people would adopt, new apportionment rules in time for the 1992 and 1994 elections. Indeed, that was one of the arguments for non-severability—to highlight the need for a new constitutional provisions regarding legislative apportionment. The Court's exhortation has not been heeded. [*In re Apportionment of State Legislature—1990,* 437 Mich 1208, 1211; 463 NW2d 713 (1990), LEVIN, J., concurring.]

In 1990, the Legislature failed to arrive at an apportionment. *In re Apportionment of the State Legislature—1992,* 439 Mich at 723. Lawsuits were filed and, in 1991, our Supreme Court appointed a panel of special masters to accomplish the reapportionment. *Id.* at 724. This Court ultimately accepted, for the most part, the plan that the masters proffered. *In re Apportionment of the State Legislature—1992,* 439 Mich 251; 483 NW2d 52 (1992).

---

[21] Notably, the commission still met, notwithstanding that the United States Supreme Court and the Michigan Supreme Court had ruled that much of the language regarding apportionment was not to be enforced. It was to be the final time that the commission was utilized.

[22] The Apol standards require single member districts, which are areas of contiguous land and drawn by as equal population as possible.

In 1996, the Legislature enacted guidelines for the redistricting of senate and house of representative districts, see MCL 4.261 *et seq.* In 1999, the Legislature passed the congressional redistricting act, MCL 3.61 *et seq.* Thus, after the past two federal decennial censuses, redistricting has occurred without a commission, as the Legislature has decided the districts. With that history in mind, we turn to the VNP Proposal to amend the Constitution to create an independent citizen redistricting commission.

## E. THE VNP PROPOSAL

The VNP Proposal seeks to make changes to 11 sections within three articles of Michigan's 1963 Constitution: Article 4 (legislative branch), Article 5 (executive branch) and Article 6 (judicial branch).[23] The majority of those changes are to Article 4, involving the existing commission on legislative apportionment. The VNP Proposal essentially would accomplish the following:

- Create an independent citizens commission regarding legislative apportionment;

- Set forth the parameters for the independent commission regarding its structure, operation and funding;

- Eliminate legislative oversight over the independent commission, vest original jurisdiction in the Supreme Court regarding challenges related to the independent commission, and create an exception in the power of the executive branch to the extent limited or abrogated by the independent commission.

The VNP Proposal creates an exception to the legislative power of the state senate and house of representatives by exempting the new independent citizens redistricting commission from legislative control.[24] The VNP Proposal retains the structure of the senate at 38 members elected from single member districts,[25] and the structure of the house of representatives with 110 members from single member districts apportioned on a basis of population.[26] However, the VNP Proposal eliminates the existing constitutional provisions in Const 1963, art 4, §§ 2-5 relating to senate districts and representative areas and their corresponding rules for apportionment.[27]

The VNP Proposal's primary change is the replacement of the current commission on legislative apportionment with parameters for a new independent citizens redistricting commission. In place of the eight-member commission, the VNP proposal provides for 13 commissioners; each major political party would have four members and the remaining five members would be declared independent voters.[28] The pool of candidates would be drawn from

---

[23] Specifically, the VNP Proposal modifies Article 4, §§ 1-6; Article 5, §§ 1, 2 and 4; and Article 6, §§ 1 and 4.
[24] VNP Proposal art 4, § 1.
[25] VNP Proposal art 4, § 2.
[26] VNP Proposal art 4, § 3.
[27] VNP Proposal art 4, §§ 2-5.
[28] VNP Proposal art 4, § 6(1).

eligible registered Michigan voters.[29] With certain exceptions, candidates would not be eligible to serve if they were current or former lobbyists, partisan elected officials or candidates, or a relative of a disqualified individual.[30]

Under the VNP Proposal, commissioners are to be chosen from a pool of applicants, which may include randomly selected voters.[31] Applicants must submit a completed application, must attest under oath that they meet the qualifications, and must identify which of the two major political parties with which they are affiliated, or whether they do not affiliate with either party.[32]

The VNP Proposal sets forth specific parameters and timelines for the application procedure, including that legislative leaders may strike candidates from consideration.[33] The proposal also designates the funding process and provides for a cause of action should funding not occur.[34]

The VNP Proposal includes considerable detail regarding the commission's public hearings and contact with the public. It specifies directives regarding the commissioners' discussion of commission business, and aims to make records available to the public.[35]

The VNP Proposal lists seven criteria for a redistricting plan, giving the most weight to population and geographic contiguity.[36] Additionally, the VNP Proposal describes guidelines for the commission's adoption of a new redistricting plan and the publication of its related data.[37]

Under the VNP Proposal, the Michigan Supreme Court has original jurisdiction regarding the independent citizens redistricting commission to: (1) direct the Secretary or commission to perform their respective duties; (2) review a challenge to any plan that the commission adopts, (3) remand a plan to the commission for further action if the plan does not comply with the requirements of the Michigan Constitution, the United States Constitution or superseding federal law.[38] Only the commission, and no other body, shall promulgate and adopt a redistricting plan.[39]

In Article 5, involving the executive branch, the VNP Proposal continues vesting the power in the executive branch but excepts the independent citizens redistricting commission, noting that the commission's powers are exclusively reserved for the commission.[40] The VNP Proposal alters section 4, involving the establishment of executive branch commissions or

---

[29] VNP Proposal art 4, § 6(1)(A).
[30] VNP Proposal art 4, § 6(1)(B)-(E).
[31] VNP Proposal art 4, § 6(2)(A)(i).
[32] VNP Proposal art 4, § 6(2)(A).
[33] VNP Proposal art 4, § 6(2).
[34] VNP Proposal art 4, § 6(5)-(6).
[35] VNP Proposal art 4, § 6(8)-(12).
[36] VNP Proposal art 4, § 6(13)(A-G).
[37] VNP Proposal art 4, § 6(14)-(15).
[38] VNP Proposal art 4, § 6(19).
[39] *Id.*
[40] VNP Proposal art 5, §§ 1-2.

agencies, by adding the language "to the extent limited or abrogated by article v, section 2 or article iv, section 6," the sections involving independent citizens redistricting commission.[41] With regard to Article 6, the judicial branch, the VNP Proposal leaves intact the power of the branch, except to the extent limited or abrogated by the independent citizens redistricting commission.[42]

## II.  ANALYSIS

> [I]n the very rare case . . . when an 'initiative petition does not meet the constitutional requires for acceptance,' a court may find it necessary to intervene in the initiative process.  But because the judicial branch should rarely interfere with the legislative process, such cases should be, and are, rare . . . .  [*Coalition for a Safer Detroit v Detroit City Clerk*, 295 Mich App 362, 372; 820 NW2d 208 (2012) (citations omitted).]

This case is not one of the rare cases where this Court should intervene.

The people of Michigan long have reserved the right to amend their constitution.  *City of Jackson v Comm'r of Revenue*, 316 Mich 694, 710; 26 NW2d 569 (1947); *Scott v Secretary of State*, 202 Mich 629, 643; 168 NW 709 (1918).  To do so, they may bring an initiative petition before the voters by submitting a proposal to be placed on the ballot.  Const 1963, art 12, § 2. *Wolverine Golf Club v Secretary of State*, 24 Mich App 711, 716; 180 NW2d 820 (1970), aff'd 384 Mich 461 (1971).  Any person or organization opposing the submission of an initiative petition may bring an action for mandamus to preclude the placement of that petition onto the ballot.  See *Hamilton v Secretary of State*, 212 Mich 31, 33; 179 NW 553 (1920); *Coalition for a Safer Detroit*, 295 Mich App at 371.  In an exceptional case, a court may deem it necessary to intervene in the initiative process.  See *Detroit v Detroit City Clerk*, 98 Mich App 136, 139; 296 NW2d 207 (1980).

### A.  MANDAMUS

This Court has jurisdiction over this original action pursuant to MCL 600.4401(1) ("[a]n action for mandamus against a state officer shall be commenced in the court of appeals . . . .").  See also MCR 7.203(C)(2).[43]  The Secretary and the Board are "state officers" for mandamus purposes.  See *Comm for Constitutional Reform v Secretary of State,* 425 Mich 336, 338 n 2; 389 NW2d 430 (1986). Further, Michigan Election Law provides that a person aggrieved by a decision of the Board may seek relief in the form of mandamus.  MCL 168.479.[44]  Thus,

---

[41] VNP Proposal, art 5, § 4.

[42] VNP Proposal, art 6, §§ 1, 4.

[43] Under that rule, this Court has jurisdiction over an action for "mandamus against a state officer."

[44] MCL 168.479 provides:  "Any person or persons, feeling themselves aggrieved by any determination made by said board, may have such determination reviewed by mandamus, certiorari, or other appropriate remedy in the supreme court."

mandamus is the proper remedy for a party seeking to compel election officials to carry out their duties. See, e.g., *Wolverine Golf Club*, 24 Mich App at 716.

This Court has the authority to issue a prerogative writ of mandamus, but mandamus is an extraordinary remedy. *LeRoux v Secretary of State*, 465 Mich 594, 606; 640 NW2d 849 (2002); *O'Connell v Director of Elections,* 316 Mich App 91, 100; 891 NW2d 240 (2016). Whether a writ issues is within the discretion of the court. See *Carter v Ann Arbor City Attorney,* 271 Mich App 425, 438; 722 NW2d 243 (2006). In a mandamus action, this Court considers whether the defendant has a clear legal duty and whether the plaintiff has a clear right to performance of that duty. *Attorney General v Bd of State Canvassers*, 318 Mich App 242, 248; 896 NW2d 485 (2016). Specifically, the plaintiff has the burden to show:

> (1) a clear legal right to the act sought to be compelled; (2) a clear legal duty by the defendant to perform the act; (3) that the act is ministerial, leaving nothing to the judgment or discretion of the defendant; and (4) that no other adequate remedy exists. [*Twp of Casco v Secretary of State*, 472 Mich 566, 621; 701 NW2d 102 (2005), YOUNG, J., concurring in part.]

A clear legal right has been defined as a right " 'clearly founded in, or granted by, law; a right which is inferable as a matter of law from uncontroverted facts regardless of the difficulty of the legal question to be decided.' " *Univ Medical Affiliates, PC v Wayne County Executive*, 142 Mich App 135, 143; 369 NW2d 277 (1985) (citation omitted). The plaintiff has the burden to demonstrate an entitlement to the extraordinary remedy of a writ of mandamus. *Herp v Lansing City Clerk,* 164 Mich App 150, 161; 416 NW2d 367 (1987).

Plaintiffs here include a duly registered ballot question committee (CPMC), a former paid employee of a political candidate (Spyke), and the parent of a person otherwise disqualified from serving on the proposed commission (Daunt). Spyke and Daunt contend that they will be aggrieved by the VNP Proposal because they would be precluded from serving on the redistricting commission pursuant to the revised criteria. They assert a clear legal right to have the Secretary and the Board reject the petition and not place it on the ballot.

The Secretary has a clear legal duty to "[p]repare the form of ballot for any proposed amendment to the constitution or proposal under the initiative or referendum provision of the constitution to be submitted to the voters of this state." MCL 168.31(1)(f). The Secretary argues, however, that her only remaining duty is to certify the ballot to the counties after Board certification.

The Board has a clear legal duty regarding ballot questions, as it examines petitions to ascertain that they have sufficient signatures. MCL 168.476. The Board also makes an official declaration regarding the sufficiency of the petition. MCL 168.477(1). The Board's duty is to certify the proposal after determining whether the form of the petition substantially complies with statutory requirements and whether the proposal has sufficient signatures in support. See *Protecting Michigan Taxpayers v Bd of State Canvassers,* __ Mich App __, ___; __ NW2d __ (2018) (Docket No. 343566); slip op at 5 n 2. In essence, the Board ascertains whether sufficient valid signatures support the petition and whether the petition is in proper form.

-12-

"A ministerial act is one in which the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Hillsdale Co Senior Servs, Inc v Hillsdale Co*, 494 Mich 46, 58 n 11; 832 NW2d 728 (2013) (quotation marks and citation omitted).

This Court has settled the question of whether the Board's and the Secretary's clear legal duties are ministerial where, as here, the parties dispute whether an initiative petition proposal is an "amendment" to, or a "general revision" of, the constitution. In *Citizens Protecting Michigan's Constitution v Secretary of State,* 280 Mich App 273; 761 NW2d 210 (2008), aff'd in result only 482 Mich 960 (2008), the panel explained that, because the determinations of whether a proposal is a general revision or an amendment to the constitution, and whether a proposal serves more than a single purpose, require judgment, they are not ministerial tasks to be performed by the Secretary or the Board. *Id.* at 286-287. However, *this Court* is obliged to make the threshold determination of whether an initiative petition meets the constitutional prerequisites for acceptance on the ballot. *Id.* at 283, 291. Based on this Court's decision, the Board and the Secretary would have a clear legal duty regarding the initiative petition. At that point, the act of the Board and the Secretary regarding the petition would be ministerial in nature, not requiring the exercise of judgment or discretion. *Id.* at 291-292. Consequently, as we have determined that the VNP Proposal meets the constitutional prerequisites, the Secretary's and the Board's actions in placing it on the ballot will be ministerial.

It does not appear to be disputed that plaintiffs had no other adequate remedy available in law or equity.

Historically, challenges regarding a petition's substance have been viewed as premature if brought before the initiative legislation comes into effect, see *Hamilton*, 212 Mich 31, but challenges regarding the legality or sufficiency of the form of the petitions themselves may be entertained earlier, *Leininger v Secretary of State*, 316 Mich 644; 26 NW2d 348 (1947). Questions whether a petition meets the constitutional prerequisites for acceptance are ripe for review. *Michigan United Conservation Clubs v Secretary of State,* 463 Mich 1009; 625 NW2d 377 (2001). Because the instant challenge is to whether the VNP Proposal is eligible to be on the ballot, the issue is ripe for review. See also, *Citizens Protecting Michigan's Constitution,* 280 Mich App at 283, 288.

### B. AMENDMENT VERSUS GENERAL REVISION

Article 12, § 2 of Michigan's 1963 Constitution addresses the amendment of the constitution via initiative petition. It sets forth the requirements for such a petition to be placed on the ballot and provides:

> Amendments may be proposed to this constitution by petition of the registered electors of this state. Every petition shall include the full text of the proposed amendment, and be signed by registered electors of the state equal in number to at least 10 percent of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected. Such petitions shall be filed with the person authorized by law to receive the same at least 120 days before the election at which the proposed amendment is to be voted

-13-

upon. Any such petition shall be in the form, and shall be signed and circulated in such manner, as prescribed by law. The person authorized by law to receive such petition shall upon its receipt determine, as provided by law, the validity and sufficiency of the signatures on the petition, and make an official announcement thereof at least 60 days prior to the election at which the proposed amendment is to be voted upon.

Any amendment proposed by such petition shall be submitted, not less than 120 days after it was filed, to the electors at the next general election. Such proposed amendment, existing provisions of the constitution which would be altered or abrogated thereby, and the question as it shall appear on the ballot shall be published in full as provided by law. Copies of such publication shall be posted in each polling place and furnished to news media as provided by law.

The ballot to be used in such election shall contain a statement of the purpose of the proposed amendment, expressed in not more than 100 words, exclusive of caption. Such statement of purpose and caption shall be prepared by the person authorized by law, and shall consist of a true and impartial statement of the purpose of the amendment in such language as shall create no prejudice for or against the proposed amendment.

If the proposed amendment is approved by a majority of the electors voting on the question, it shall become part of the constitution, and shall abrogate or amend existing provisions of the constitution at the end of 45 days after the date of the election at which it was approved. If two or more amendments approved by the electors at the same election conflict, that amendment receiving the highest affirmative vote shall prevail.[45]

The above language does not impose, or even suggest, limitation on the scope of a voter initiative proposing a constitutional amendment.

In contrast, Article 12, § 3 of the 1963 Constitution, involves general revision of the Constitution via a constitutional convention and it provides:

At the general election to be held in the year 1978, and in each 16th year thereafter and at such times as may be provided by law, the question of a general revision of the constitution shall be submitted to the electors of the state. If a majority of the electors voting on the question decide in favor of a convention for such purpose, at an election to be held not later than six months after the proposal was certified as approved, the electors of each representative district as then organized shall elect one delegate and the electors of each senatorial district as then organized shall elect one delegate at a partisan election. The delegates so

_____

[45] The 1835 Michigan Constitution included a passage regarding constitutional amendments, Const 1835, art 13, § 1, but limited those amendments to the Legislature. The 1908 Constitution permitted amendments by petition Const 1908, art 17, § 2.

elected shall convene at the seat of government on the first Tuesday in October next succeeding such election or at an earlier date if provided by law.

The convention shall choose its own officers, determine the rules of its proceedings and judge the qualifications, elections and returns of its members. To fill a vacancy in the office of any delegate, the governor shall appoint a qualified resident of the same district who shall be a member of the same party as the delegate vacating the office. The convention shall have power to appoint such officers, employees and assistants as it deems necessary and to fix their compensation; to provide for the printing and distribution of its documents, journals and proceedings; to explain and disseminate information about the proposed constitution and to complete the business of the convention in an orderly manner. Each delegate shall receive for his services compensation provided by law.

No proposed constitution or amendment adopted by such convention shall be submitted to the electors for approval as hereinafter provided unless by the assent of a majority of all the delegates elected to and serving in the convention, with the names and vote of those voting entered in the journal. Any proposed constitution or amendments adopted by such convention shall be submitted to the qualified electors in the manner and at the time provided by such convention not less than 90 days after final adjournment of the convention. Upon the approval of such constitution or amendments by a majority of the qualified electors voting thereon the constitution or amendments shall take effect as provided by the convention.[46]

Our courts long have recognized that an amendment is not the same as a general revision and have attempted to define the differences between them where the constitutional provisions themselves do not define the terms. Eight decades ago, in 1932, our Supreme Court discussed the fundamental distinctions between revision and amendment in *Kelly v Laing*, 259 Mich 212; 242 NW 891 (1932). The Court held that an initiative petition may encompass one proposed amendment, but may involve more than one section, provided "all sections are germane to the purpose of the amendment." *Id.* at 216. Another question raised in *Laing* was whether the changes at issue could be raised by amendment, or whether they comprised a general revision. The Court described the differences between the two concepts:

'Revision' and 'amendment' have the common characteristics of working changes in the charter and are sometimes used inexactly, but there is an essential difference between them. Revision implies a re-examination of the whole law and a redraft without obligation to maintain the form, scheme, or structure of the old. As applied to fundamental law, such as a constitution or charter, it suggests a convention to examine the whole subject and to prepare and submit a new instrument, whether the desired changes from the old be few or many. Amendment implies continuance of the general plan and purport of the law, with

---

[46] Michigan's 1835 Constitution contained a section regarding a constitutional convention. See Const 1835, art 13, § 2.

corrections to accomplish its purpose. Basically, revision suggests fundamental change, while amendment is a correction of detail. [*Id.* at 217.]

Our Supreme Court added:

An amendment is usually proposed by persons interested in a specific change and little concerned with its effect upon other provisions of the charter. [In contrast, t]he machinery of revision is in line with our historical and traditional system of changing fundamental law by convention, which experience has shown best adapted to make necessary readjustments. [*Id.* at 221-222.]

One year after *Laing*, our Supreme Court had occasion to consider whether a proposal was a revision or an amendment in *Sch Dist of City of Pontiac v City of Pontiac,* 262 Mich 338, 344; 247 NW 474 (1933). The plaintiff argued that the proposal to limit property taxes that had been approved in the general election was so far-reaching as to invalidate the Constitution and thus was a general revision. The Court disagreed, concluding that it was an amendment because the proposal did not "interfere with" nor "modify" the operation of governmental agencies in such a way to render it a general revision.[47] *Id.* at 345.

In 2008, building on the precepts from *Laing* and *Pontiac*, this Court discussed the difference between an amendment of the constitution and a general revision of the constitution in *Citizens Protecting Michigan's Constitution,* 280 Mich App 273. Regarding a complaint for mandamus filed by plaintiff CPMC concerning an initiative petition from Reform Michigan Government Now (RMGN) for the general election ballot, this Court analyzed the constitutional provisions governing an amendment, as compared to a general revision. The Court held that it was "absolutely clear" that the procedures for constitutional amendment could not achieve a general revision of the constitution. *Id.* at 277. While the constitution provides for amendment under the initiative petition procedure Article 12, § 2, a general revision of the constitution can occur only by the constitutional convention procedure in Article 12, § 3. *Id.*

This Court decided that the courts also must consider "the degree to which the proposal interferes with, or modifies, the operation of government." *Id.* at 298. The more the proposal modifies or interferes with the operation of government, the more likely it is to be a general revision. *Id.* The Court held:

[T]o determine whether a proposal effects a 'general revision' of the constitution, and is therefore not subject to the initiative process established for amending the constitution, the Court must consider both the quantitative nature and the qualitative nature of the proposed changes. More specifically, the determination depends on, not only the number of proposed changes or whether a wholly new constitution is being offered, *but on the scope of the proposed changes and the*

---

[47] In light of *Laing* and *Pontiac* from our Supreme Court, it is puzzling why intervening defendants chose to discuss alternate definitions of "amendment" and "revision." We rely on the terms as defined in *Laing,* rather than the dictionary definitions proffered by intervening defendants.

-16-

*degree to which those changes would interfere with, or modify, the operation of government.* [*Id.* at 305 (emphasis supplied).]

The RMGN proposal in *Citizens Protecting Michigan's Constitution* would have made myriad changes to the 1963 Michigan Constitution related to a far-ranging field of topics, from reducing the number of senators, representatives, appellate justices and judges, to granting any citizen standing for certain environmental lawsuits, to limiting lobbying activities; the opinion listed 29 distinct changes to a multitude of constitutional provisions. *Id.* at 279-281. The proposal also would have created a new commission with authority over legislative districting, established rules for creating legislative districting plans and eliminated judicial review over districting plans. *Id.* at 280. In total, it would have altered over two dozen sections of four articles within the constitution and added four additional sections. *Id.* at 295.

This Court decided that the RMGN proposal did not "even approach the 'field of application' for the amendment procedure." *Id.* at 305 (citation omitted). The Court observed that the proposal would have modified "the fundamental governmental structure" under the Constitution. *Id.* at 306. Moreover, it would have done so in an abrupt manner, within less than six months of the November 2008 election. *Id.* at 306-307. The Court concluded that "[t]he substantial entirety of the petition alters the core, fundamental underpinnings of the constitution, amounting to a wholesale revision, not a mere amendment." *Id.* at 307. Our Supreme Court affirmed in result only and did not adopt this Court's reasoning.[48]

The RMGN proposal would have reorganized the operation of the whole state government. The same is simply not true in this case. Here, rather than proposing "sprawling compilations of changes" as characterized by plaintiffs, the VNP Proposal has a singular focus: to create an independent citizen redistricting commission with exclusive authority to establish redistricting plans for legislative districts. This case therefore is quickly distinguishable from the much broader RMGN proposal in *Citizens Protecting Michigan's Constitution.*

The question then becomes whether, under the *Citizens Protecting Michigan's Constitution* legal framework, the VNP Proposal falls within the description of an amendment. Intervening defendants argue that this Court should limit *Citizens Protecting Michigan's Constitution* to its own "highly unusual" facts, particularly because the Court set forth a qualitative/quantitative standard borrowed primarily from the decisions of other state courts. Nevertheless, we are bound by *Citizens Protecting Michigan's Constitution* as a published decision issued after 1990, MCR 7.215(J)(1). But even in following *Citizens Protecting Michigan's Constitution,* we keep in mind that Court's clarification at the outset that its decision was not "to prevent the citizens from voting on a proposal simply because that proposal is allegedly too complex or confusing." *Id.* at 276.

---

[48] In Justice Corrigan's concurrence, she noted that this Court did not clearly err in its articulation of the difference between an amendment and a general revision or in its ultimate conclusion. Two justices agreed with her. *Citizens Protecting Michigan's Constitution*, 482 Mich at 964 (CORRIGAN, J., concurring). However, as noted, a majority of our Supreme Court did not adopt this Court's reasoning.

Four years after *Citizens Protecting Michigan's Constitution*, our Court had an occasion to consider whether a ballot initiative was an amendment or a general revision in *Protect Our Jobs v Bd of State Canvassers (On Remand)*, unpublished per curiam opinion of the Court of Appeals, issued August 27, 2012 (Docket No. 311828), aff'd on other grounds 492 Mich 763 (2012).[49] The proposal would have added a new article 1, § 28 to provide the right to bargain collectively, and a new paragraph to article 11, § 5 to protect the collective bargaining right for classified civil service employees. CPMC challenged the proposal as, among other things, being a general revision rather than an amendment. *Id.* at 1-2. This Court relied on the qualitative and quantitative test in *Citizens Protecting Michigan's Constitution.* The Court acknowledged that the proposal might have an effect on provisions and statutes, but also observed that the proposal was confined to a single subject matter and directly added only one section to the constitution and changed one other. This Court resolved that the initiative proposal was "far more akin to a correction of detail than a fundamental change, when viewed in the proper context of the constitution as a whole." *Id.* at 2-3.

This case falls somewhere between *Citizens Protecting Michigan's Constitution* and *Protect Our Jobs.* The VNP Proposal is nowhere near as diverse and titanic as the RMGN proposal, but nor is it as concise as the proposal in *Protect Our Jobs.*

Here, the VNP Proposal maintains the structure of a commission for legislative districting. It continues the general plans for a commission, but changes the details of how the commission members are chosen and the specifics regarding the commission's operation. It does not seek to change fundamental law—senate and house members still will represent, and be chosen by, voters in legislative districts and the number of senators and representatives will not change, unlike the RMGN proposal. The VNP proposal was put forward by a ballot committee intent on a specific change: to modify the commission membership to provide for an independent commission to draw legislative lines, and restrict membership on the commission to those who essentially are not partisan elected officials or lobbyists. In short, the VNP Proposal was intended to remedy perceived abuses from partisan gerrymandering of districts. This proposal does not interfere with or modify the operation of the government in such a way as to render it a general revision. Here, the provision seeks only to modify the section of the constitution that involve a single, narrow focus—the independent citizen redistricting commission.

We acknowledge that the *Citizens Protecting Michigan's Constitution* Court commented upon a portion of the RMGN proposal dealing with the proposed changes to the districting commission:

> As just one example, the proposal strips the Legislature of any authority to propose and enact a legislative redistricting plan. It abrogates a portion of the judicial power by giving a new executive branch redistricting commission authority to conduct legislative redistricting. It then removes from the judicial branch the power of judicial review over the new commission's actions. We

---

[49] On later appeal in *Protect Our Jobs,* our Supreme Court did not address the general revision/amendment argument raised in this Court, but limited its analysis to the republication requirement of Const 1963, art 12, § 2 and MCL 168.482(3).

agree with the Attorney General that the proposal affects the 'foundation power' of government by 'wresting from' the legislative branch and the judicial branch any authority over redistricting and consolidating that power in the executive branch, albeit in a new independent agency with plenary authority over redistricting. [*Citizens Protecting Michigan's Constitution,* 280 Mich App at 306.]

The instant proposal does not wrest complete power from the legislative branch and the judicial branch, where the legislature retains the power to veto potential commission members and the judiciary retains control over challenges related to the commission. The proposal does shift the duty of redistricting from the Legislature to the independent commission, a commission that is similar in structure to the one described in our existing constitution. The proposal does not otherwise reduce general legislative power.

With regard to our Supreme Court, the proposal provides for Supreme Court oversight in a similar manner to the existing constitutional provisions, but does preclude the Supreme Court from ordering the adoption of a plan other than that arrived at by the independent commission. The power of the executive branch would not be materially changed, although the commission's functions would not be subject to control by the Governor. Plaintiffs seek to parse out these changes into 14 enumerated points, but those points merely seek to shift the Court's focus from the forest to the trees. This issue should not be made more complicated than necessary.

Further, the *Citizens Protecting Michigan's Constitution* Court did not consider the proposed change in isolation, but as one part of the 29 items on the vast proposal. *Citizens Protecting Michigan's Constitution* did not hold that an initiative could not succeed on any *one* of those 29 subjects; rather, it held that the petition encompassing *all* 29 changes could not be considered a mere amendment. We do not construe the proposed amendment here as so far-reaching in the framework of the constitution so as to be a reexamination of the whole section. Where our existing Constitution has provided for a commission to draw the districting lines, it follows that an independent commission to do the same would not be so violative of the Constitution so as to preclude this proposal from placement on the ballot.

Moreover, the VNP Proposal is not wholly new. It does not create an entirely new commission regarding redistricting; the commission already exists in our Constitution, although admittedly it has not been active for decades given *Reynolds*. The VNP Proposal merely changes the method by which the commissioners will be chosen going forward and adds additional members who are avowed independent voters. It does not wholly impede legislative power, where legislative leaders retain the power to veto proposed commission members. Undeniably, it introduces new concepts,[50] but it does so in a finite manner. The body of Michigan case law does not hold that the addition of new concepts within the framework of our existing constitution precludes an initiative petition.

---

[50] VNP's general counsel's admitted as much in his August 9, 2017 memorandum to the Board: "Creating a 'commission' that is not subject to the oversight or authority of the executive branch is a new and significantly different concept not previously found within the 1963 Constitution. Further, though this commission would be housed within the legislative branch, its actions are not subject to approval or oversight by the Legislature. This is another new concept."

Plaintiffs maintain that the VNP Proposal abandons core redistricting criteria that have existed since the State's founding. Our Supreme Court has ruled that "[t]he basic building blocks of the apportionment rules are the counties." *In re Apportionment of State Legislature—1982,* 413 Mich at 125. The public policy issues raised by the proposal's nonadherence to the county framework are not the province of this branch of government at this stage of the initiative petition process. We do not believe that the choosing of geographical legislative districts for representation is truly a "fundamental function" or an "operation of government."

With regard to the quantitative portion of the *Citizens Protecting Michigan's Constitution,* the VNP Proposal changes eleven sections within three articles of the constitution. The *essential* changes can be quickly enumerated, yet plaintiffs repeatedly point out that the proposal would add 4,834 words to the constitution and even included a bar graph in their reply brief. VNP should not be penalized for including specific details within its proposal, particularly where many of the proposed additions are merely operational details.

Plaintiffs also argue that the proposal is multifarious and goes beyond the scope of a single amendment. The VNP Proposal is undeniably detailed, but it is targeted to achieve a single, specific purpose. To the extent that plaintiffs urge this Court to accept that the meaning of an amendment includes a "short" correction to the existing constitution, we have found no such limitation in legal authority.

Further, plaintiffs maintain that the proposal should have a lengthy explanation of its changes, pointing out that the information disseminated after the 1961-1962 Constitutional Convention included a 109-page pamphlet. Here, such a lengthy pamphlet would not be necessary to describe the changes proposed by the VNP Proposal, particularly when considering that the most recent constitutional convention resulted in myriad innovative changes to the existing constitution, including the mandate of equal rights protections and the establishment of the Civil Rights Commission.

Plaintiffs also argue that the multifarious nature of the VNP Proposal is illustrated by the fact that it cannot be easily summarized into 100 words. This argument is premature, as the Director of Elections has not yet fulfilled her duty under MCL 168.32(2) to draft the 100-word summary.

Plaintiffs add that some of the requirements of the proposal will be impossible to comply with, focusing on the requirement that the Secretary select commissioners in a manner that mirrors the demographic makeup of the state. That argument is irrelevant to the threshold question before this Court regarding whether the proposal is eligible to be placed on the ballot, but instead pertains to the merits of the proposal, an issue that is not before this Court.

In sum, we opine that the VNP Proposal is closer to the proposal in *Protect Our Jobs* than to the proposal in *Citizens.* We hold that the VNP Proposal*,* although undeniably introducing new concepts, does not modify or interfere with the fundamental operation of government or create a wholly new constitutional provision so as to make it a general revision to the Constitution rather than an amendment.

C. REPUBLICATION

Proposals to amend the Constitution must publish those sections that the proposal will alter or abrogate. Article 12, § 2 governs amendment of the constitution by petition and vote and it provides, in pertinent part: "Such proposed amendment, existing provisions of the constitution which would be altered or abrogated thereby, and the question as it shall appear on the ballot shall be published in full as provided by law." The provision's aim is to advise the voter of the amendment's purpose and identify which provision(s) of the constitutional law it changes or replaces. *Massey v Secretary of State,* 457 Mich 410, 417; 579 NW2d 862 (1998). Care must be taken, however, not to confuse the voter by publishing myriad constitutional provisions "which were or might be directly or only remotely, and possibly only contingently, affected by the proposed amendment." *Sch Dist of City of Pontiac v City of Pontiac,* 262 Mich at 344.

The Legislature has enacted the publishing requirements for petitions. MCL 168.482(3) provides in relevant part: "If the proposal would alter or abrogate an existing provision of the constitution, the petition shall so state and the provisions to be altered or abrogated shall be inserted, preceded by the words: 'Provisions of existing constitution altered or abrogated by the proposal if adopted.' "[51]

Our Supreme Court has held that an initiative petition must comply with mandatory statutory provisions that set forth requirements regarding a petition's form. *Stand Up for Democracy v Board of State Canvassers,* 492 Mich 588; 822 NW2d 159 (2012).[52] Where MCL 168.482(3) contains the mandatory term "shall," petitions must comply with the republication requirement. *Protect Our Jobs,* 492 Mich at 778. Provisions of the constitution must be republished on petitions where "a proposed constitutional provision amends or replaces ('alters or abrogates') a specific provision of the Constitution, that such provision should be published along with the proposed amendment . . . ." *Sch Dist of City of Pontiac,* 262 Mich at 344. Our Supreme Court has explained that an alteration or abrogation ensues "if the proposed amendment would add to, delete from, or change the existing wording of the provision, or would render it wholly inoperative." *Ferency v Secretary of State*, 409 Mich 569, 597; 297 NW2d 544 (1980). The fact that a proposed amendment will affect a provision does not inevitably mean the provision is "altered or abrogated." *Id.* at 596–597.

In 2012, our Supreme Court observed that the republication requirement continued to be subject to debate, which inspired the Court to provide additional clarity. It reasoned that, to establish that a proposed amendment "alters" an existing provision such that republication is required, an amendment must: (1) add words to an existing provision; (2) delete words from an existing provision; or (3) change the wording in an existing provision. *Protect Our Jobs*, 492 Mich at 782. Consequently, the Court concluded that a new constitutional provision does not

---

[51] We reject intervening defendants' contention that the statutory republication requirement in MCL 168.482(3) is unconstitutional because it imposes undue burdens upon the exercise of the people's right to propose amendments via voter initiative. Where our Supreme Court has applied the requirements of MCL 168.482 to voter initiative petitions, this Court is bound by that legal authority and thus does not consider the constitutionality of the statute.

[52] Intervening defendants argue that *Stand Up* does not apply here because the language of Const 1963, art 2, § 9, which was at issue in *Stand Up*, is substantially different from the language of Const 1963, art 12, § 2, at issue here. Notwithstanding, where our Supreme Court cited *Stand Up* in *Protect Our Jobs,* which involved Const 1963, art 2, § 2, this Court does likewise.

"alter" an existing provision where the new provision leaves completely intact the text of all existing provisions.[53]  *Id.*

With regard to whether an amendment "abrogates" an existing provision, the *Protect Our Jobs* Court stated that "the 'abrogation' standard makes clear that republication is only triggered by a change that would essentially eviscerate an existing provision."  *Id.*  The Court went on to state:

> Our caselaw establishes that an existing provision of the Constitution is abrogated and, thus, must be republished if it is rendered 'wholly inoperative.'  An existing constitutional provision is rendered wholly inoperative if the proposed amendment would make the existing provision a nullity or if it would be impossible for the amendment to be harmonized with the existing provision when the two provisions are considered together.  That is, if two provisions are incompatible with each other, the new provision would abrogate the existing provision and, thus, the existing provision would have to be republished.  An existing provision is not rendered wholly inoperative if it can be reasonably construed in a manner consistent with the new provision, i.e., the two provisions are not incompatible.
>
> Determining whether the existing and new provisions can be harmonized requires careful consideration of the actual language used in both the existing provision and the proposed amendment.  An existing provision that uses nonexclusive or nonabsolute language is less likely to be rendered inoperative simply because a proposed new provision introduces in some manner a change to the existing provision.  Rather, when the existing provision would likely continue to exist as it did preamendment, although it might be affected or supplemented in some fashion by the proposed amendment, no abrogation occurs.  On the other hand, a proposed amendment more likely renders an existing provision inoperative if the existing provision creates a mandatory requirement or uses language providing an exclusive power or authority because any change to such a provision would tend to negate the specifically conferred constitutional requirement.  [*Id.* at 782-783 (citations omitted).]

The abrogation inquiry requires examination of the entire existing constitutional provision, as well as the provision's "discrete subparts, sentences, clauses, or even, potentially, single words."  *Id.* at 784.  The petition must republish the entire provision if the proposed amendment "renders wholly inoperative" any of the existing provision's components.  *Id.*

The Court summarized its holding regarding republication as follows:

> 1.      When the existing language of a constitutional provision would be altered or abrogated by the proposed amendment, republication of the existing provision is required.

---

[53] "The phrase 'the existing wording' should be taken literally."  *Massey*, 457 Mich at 418.

2.     The language of the amendment itself, rather than how proponents or opponents of the amendment characterize its meaning, controls whether an existing provision would be altered or abrogated by the proposed amendment.

3.     When the existing language of a constitutional provision would not be altered, but the proposed amendment would render the entire provision or some discrete component of the provision wholly inoperative, abrogation would occur and republication of the existing language is required.

4.     When the existing language would not be altered or abrogated, but the proposed amendment would only have an effect on the existing language, and the new and existing provisions can be harmoniously construed, republication of the existing provision is not required.

5.     When the existing language would not be altered or abrogated, but the proposed amendment would only have an effect on the existing language, thereby requiring that the new and existing provisions be interpreted together, republication of the existing provision is not required. [*Id.* at 791-792.]

Additionally, the *Protect Our Jobs* Court cited *Ferency's* caution against adopting an overly expansive definition of the terms "alter or abrogate" so as not to "chill" the people's ability to amend the constitution. It added that petition circulators should not be required to append the entire constitution to their petition. *Id.* at 780 (citing *Ferency*, 409 Mich at 597-598). The courts and the Legislature may not impose "undue burdens" on the people's right to amend. *Wolverine Golf Club*, 384 Mich at 466 (citation omitted).

The VNP Proposal does not *alter* the challenged sections at issue because it does not add words, delete words or change words in the existing sections. Consequently, the analysis that follows examines only whether the VNP Proposal *abrogates* existing constitutional provisions.

1.  CIRCUIT COURT JURISDICTION

Existing Const 1963, art 6, § 13 provides:

The circuit court shall have original jurisdiction in all matters not prohibited by law; appellate jurisdiction from all inferior courts and tribunals except as otherwise provided by law; power to issue, hear and determine prerogative and remedial writs; supervisory and general control over inferior courts and tribunals within their respective jurisdictions in accordance with rules of the supreme court; and jurisdiction of other cases and matters as provided by rules of the supreme court.

In the VNP Proposal, article 4, § 6(19) provides, in relevant part:

The Supreme Court, in the exercise of original jurisdiction, shall direct the Secretary of State or the Commission to perform their respective duties, may review a challenge to any plan adopted by the commission, and shall remand a plan to the commission for further action if the plan fails to comply with the

-23-

requirements of this Constitution, the Constitution of the United States or superseding federal law.[54]

Plaintiffs contend that the proposal creates original jurisdiction over redistricting matters in the Supreme Court instead of in the circuit court and that § 6(19) abrogates Const 1963, art 6, § 13 because it would divest the circuit court of its exclusive original jurisdiction. Notably, our current constitution already gives the Supreme Court authority over redistricting commission matters, Const 1963, art 4, § 6, ¶¶ 7-8.

Also, the substance of Const 1963, art 6, § 13 would not be changed by the VNP Proposal. Article 6, § 13 does not have exclusive language. Rather, it provides the circuit court with jurisdiction in *all matters not prohibited by law*, which illustrates that the framers intended that the circuit courts' jurisdiction would have exceptions. Article 6, § 13 therefore does not suggest that such jurisdiction cannot be limited or affected by other constitutional provisions.

Indeed, our Courts recognize that exceptions to the circuit court's jurisdiction exist. Plaintiffs cite *Bowie v Arder,* 441 Mich 23; 490 NW2d 568 (1992), for their proposition that the VNP Proposal abrogates Const 1963, art 6, § 13 because the change would be not "by law," but by constitutional decree. Notwithstanding, the *Bowie* Court recognized that the circuit courts' jurisdiction may be subject to an exception where jurisdiction is "given exclusively to another court by constitution or statute . . . ." *Id.* at 38. See also MCL 600.605.[55] See also, *Prime Time Int'l Distributing, Inc v Dep't of Treasury,* 322 Mich App 46, 52; 910 NW2d 683 (2017), observing that the circuit courts are presumed to have jurisdiction unless expressly prohibited or jurisdiction is given to another court by constitution or statute.

Further, the VNP Proposal can be harmonized with Const 1963, art 6, § 13 because the only effect is that the circuit court will not have jurisdiction over the commission. In all other respects, Const 1963, art 6, § 13 remains unaffected. The existing constitutional provision has not been eviscerated. No abrogation therefore would occur because the existing provision would be neither negated nor rendered wholly inoperative.

## 2. FREEDOM OF SPEECH

Const 1963, art 1, § 5 provides as follows:

> Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press.

The VNP Proposal provides in article 4, § 6(11), in relevant part:

---

[54] The proposed language appears on the petition in all capital letters, but for ease of readability, we have not used all capital letters.

[55] That statute provides: "Circuit courts have original jurisdiction to hear and determine all civil claims and remedies, except where exclusive jurisdiction is given in the constitution or by statute to some other court or where the circuit courts are denied jurisdiction by the constitution or statutes of this state."

The Commission, its members, staff, attorneys, and consultants shall not discuss redistricting matters with members of the public outside of an open meeting of the Commission, except that a commissioner may communicate about redistricting matters with members of the public to gain information relevant to the performance of his or her duties if such communication occurs (a) in writing or (b) at a previously publicly noticed forum or town hall open to the general public.

Plaintiffs suggest that the VNP Proposal would restrict the free speech of commissioners. They argue that the restrictions on the liberty of speech would extend to matters beyond commission matters and they suggest that the restrictions are neither in the public interest nor in keeping with the rights of the public officials. We reject these policy arguments, as the issue before this Court is the alleged abrogation of existing constitutional provisions, not whether the VNP Proposal promotes sound social policy. We also point out that the speech of government employees may be subject to certain restrictions given the public employees' potential to express views that are contrary to governmental policies; a citizen entering government service "must accept certain limitations on his or her freedom [of speech]." *Shirvell v Dep't of Attorney General,* 308 Mich App 702, 733; 866 NW2d 478 (2015) (quotation marks and citations omitted).

With regard to abrogation, none would occur because Const 1963, art 1, § 5 would remain fully operative. Section 6(11) of the VNP Proposal does not restrict all speech, but does place limits on matters related to official commission work. Commissioners would retain their right to speak freely, but when speaking on official business, they would be restricted to doing so in an open meeting, in writing, or at a publicly noticed public forum. That constraint is accounted for by the condition in Const 1963, art 1, § 5 that every person "is responsible for the abuse of that right [to free speech]." Thus, the right to free speech is not wholly unrestricted.

Additionally, Const 1963, art 1, § 5 is not rendered a nullity because it has relevancy well beyond the scope of matters related to the commission. The VNP Proposal does not replace Const 1963, art 1, § 5, nor does it render that section wholly inoperative. Plaintiffs have taken a very broad view of the *Protect Our Jobs* standard, arguing that "*any* abrogation," even a slight one, requires republication. A restriction, however, is not an abrogation—and *Protect Our Jobs* holds that the provisions must be impossible to harmonize. Republication is not required when the new proposed amendment would have only an effect on existing language. *Protect Our Jobs,* 492 Mich at 791-792.

### 3. APPROPRIATIONS CLAUSE

The Appropriations Clause, Const 1963, art 9, § 17, provides:

No money shall be paid out of the state treasury except in pursuance of appropriations made by law.

The VNP Proposal sets forth article 4, § 6(5), in relevant part:

Each commissioner shall receive compensation at least equal to 25 percent of the governor's salary. The State of Michigan shall indemnify commissioners for

-25-

costs incurred if the Legislature does not appropriate sufficient funds to cover such costs.

Plaintiffs contend that the existing provision is incompatible with the proposed requirement that the state compensate and indemnify commissioners for costs incurred even absent an appropriation. They note that the proposal mandates indemnification of commissioners even if the Legislature does not approve sufficient funding.

In examining the Appropriations Clause from the 1908 Constitution,[56] our Supreme Court recognized that "the weight of authority" held that the clause did not restrict appropriations to enactments from the Legislature, but also afforded "a constitutional appropriation apart from any action by the legislature." *Civil Service Comm v Auditor General*, 302 Mich 673, 679; 5 NW2d 536 (1942). But even so, the VNP Proposal accounts for the legislative appropriation, as it provides for a cause of action if the Legislature does not appropriate the funds—thereby indicating that the money is to come from the Legislature via an appropriation.

Plaintiffs' claims that the commission will have an unlimited budget and that the state's assets will be subject to the "unrestricted whims" of the commissioners are irrelevant as they do not pertain to the question of whether the VNP Proposal abrogates the existing appropriations clause by setting forth a particular minimum budget for the commission and providing for a cause of action if the Legislature fails to appropriate the funds. The proposed § 6(5) does not require a payment from the State Treasury absent an appropriation, but merely provides for a constitutional cause of action should the Legislature fail to fulfill its obligation to fund the commission. To the extent that plaintiffs argue that the courts cannot order the Legislature to make an appropriation, that question need not be settled at this time. Here, the only question is whether the VNP proposed amendment replaces, renders wholly operative or eviscerates the appropriations clause. It does not.

## 4. OATH OF OFFICE

Const 1963, art 11, § 1 concerns the oath taken by public officers and provides:

> All officers, legislative, executive and judicial, before entering upon the duties of their respective offices, shall take and subscribe the following oath or affirmation: I do solemnly swear (or affirm) that I will support the Constitution of the United States and the constitution of this state, and that I will faithfully discharge the duties of the office of ………. according to the best of my ability. No other oath, affirmation, or any religious test shall be required as a qualification for any office or public trust.

The VNP Proposal sets forth article 4, § 6(2), in relevant part:

(2) Commissioners shall be selected through the following process:

(A) The Secretary of State shall do all of the following:

---

[56] The language from the 1908 Appropriations Clause, Const 1908, art 10, § 16, is the same as the language in the current version.

* * *

(III) Require applicants to attest under oath that they meet the qualifications set forth in this section; and either that they affiliate with one of the two political parties with the largest representation in the Legislature (hereinafter, 'major parties') and if so, identify the party with which they affiliate, or that they do not affiliate with either of the major parties. . . .

Plaintiffs maintain that the existing provision requires only one oath, and the new provision would render the existing provision a nullity. The affirmation in proposed § 6(2)(a)(ii) is not an oath of office, but is merely an affirmation that the applicant satisfies the commissioner qualifications, which are enumerated in a separate section, § 6(1). This position finds support in *Advisory Opinion on Constitutionality of 1975 PA 227,* 396 Mich 465, 510: 242 NW2d 3 (1976), where our Supreme Court ruled that an oath regarding financial disclosure was akin to the affidavits required to file a nominating petition under MCL 168.558.

In contrast, the oath in *Harrington v Secretary of State,* 211 Mich 395, 396; 179 NW2d 283 (1920), cited by plaintiffs, required the candidate to swear in part that he would "support the principles of [the] political party of which he is a member if nominated and elected." That loyalty oath was to cover the entire term of office, even after election, and for so long as he or she remained in office. In ruling that the oath was unconstitutional, the Court cited with approval the Attorney General's reasoning that the candidate would be bound by an oath other than the constitutional oath of office. *Id.* at 397. The same is not true here, as the oath required by the VNP Proposal relates only to the information on the application and does not bind a candidate once he or she becomes a commissioner.

Thus, the existing oath of office provision is unaffected by the affirmation. The proposal does not make the existing constitutional provision a nullity.

## 5. CIVIL SERVICE EMPLOYEES

In a footnote, plaintiffs add a final example, stating that VNP Proposal should have republished Const 1963, art 11, § 5, regarding civil service employees, where the Civil Service Commission has the authority to regulate "all conditions of employment in the classified service." The VNP Proposal in art 4, § 6(21) provides:

Notwithstanding any other provision of law, no employer shall discharge, threaten to discharge, intimidate, coerce, or retaliate against any employee because of the employee's membership on the commission or attendance or scheduled attendance at any meeting of the commission.

Plaintiffs argue that if a civil service employee becomes a member of the commission, the Civil Service Commission's authority over "all conditions of employment" will no longer be exclusive. This argument has been abandoned, as plaintiffs opted to give it cursory treatment. *Huntington Nat'l Bank v Daniel J Aronoff Living Trust*, 305 Mich App 496, 517; 853 NW2d 481 (2014). Even so, the two provisions can be harmonized. Therefore, we cannot conclude that the proposal abrogates the existing provision.

## D. CROSS-COMPLAINT

Intervening defendants seek a writ of mandamus against defendants to direct defendants to comply with their duties concerning certification, approval and placement of the VNP Proposal on the 2018 general election ballot. We have concluded that plaintiffs' complaint for mandamus should be denied. Consequently, intervening defendants' cross-claim should be granted with respect to the Board, as the Board has the duty to make the final decision regarding the sufficiency of the petition. Intervening defendants also ask that this Court designate that its order have immediate effect pursuant to MCR 7.215(F)(2).

## III. CONCLUSION

The complaint is without merit. The petition is not a general revision of the constitution, where it is narrowly tailored to address a single subject: the replacement of the current constitutional provision providing for an eight-member redistricting commission with a thirteen-member commission comprised of eight partisan members and five members who are declared independent voters not affiliated with either major political party. The VNP Proposal is confined to a single purpose, that of correcting the partisan aspects of the constitutional provisions regarding the redistricting commission and does so without interfering with the operation of government. Hence, we decide that the proposal is an amendment, albeit an amendment set forth in considerable detail, permitted by voter initiative. Also, the petition complies with the republication requirement. The petition neither abrogates nor alters the existing sections of the constitution as asserted by plaintiffs.

The complaint for mandamus is denied and the cross-complaint is granted. Defendant Board is directed to take the necessary steps to place the proposal on the ballot for the general election. No costs, a public question being involved. This opinion is given immediate effect pursuant to MCR 7.215(F)(2).

/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood

-28-

# Court of Appeals, State of Michigan

## ORDER

Citizens Protecting Michigan's Constitution v Secretary of State

Docket No.    343517

Mark J. Cavanagh
Presiding Judge

Kirsten Frank Kelly

Karen M. Fort Hood
Judges

The Court orders that the complaint for a writ of mandamus is DENIED. The Voters Not Politicians proposal offered by intervening defendants does not set forth a general revision of the constitution, but is confined to the single purpose of modifying current constitutional provisions regarding the redistricting commission. Therefore, the proposed constitutional amendment in this case is permitted by way of a ballot initiative. See *Citizens Protecting Michigan's Constitution v Secretary of State,* 280 Mich App 273; 761 NW2d 210 (2008), aff'd in result only 482 Mich 960 (2008). Further, the petition complies with the republication requirement of MCL 168.482(3), where the petition neither abrogates nor alters the existing sections of the constitution as asserted by plaintiffs. *Protect Our Jobs v Bd of State Canvassers (On Remand)*, 492 Mich 763; 822 NW2d 534 (2012).

The cross-complaint is GRANTED. Defendants are directed to take all necessary measures to place the proposal on the November 2018 general election ballot. This order is given immediate effect pursuant to MCR 7.215(F)(2).

/s/ Mark J. Cavanagh

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

June 7, 2018
Date

Chief Clerk