*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MICHIGAN ALLIANCE FOR RETIRED
AMERICANS, DETROIT/DOWNRIVER
CHAPTER OF THE A. PHILIP RANDOLPH
INSTITUTE, CHARLES ROBINSON, GERARD
McMURRAN, and JIM PEDERSON,

        Plaintiffs-Appellees,

v

SECRETARY OF STATE and ATTORNEY
GENERAL,

        Defendants,

and

SENATE and HOUSE OF REPRESENTATIVES,

        Intervening Defendants-Appellants,

and

REPUBLIC NATIONAL COMMITTEE and
MICHIGAN REPUBLICAN PARTY,

        Proposed Intervening Defendants.

FOR PUBLICATION
October 16, 2020

No. 354993
Court of Claims
LC No. 20-000108-MM

Before: CAMERON, P.J., and BOONSTRA, and GADOLA, JJ.

BOONSTRA, J. (*concurring*).

I fully concur in the opinion of the Court. I write separately to underscore that judicial overreach is just as pernicious as executive overreach. The judicial overreach in this case requires that we reverse the Court of Claims, vacate its order granting summary disposition in favor of plaintiffs as well as its preliminary and permanent injunctions, and remand with instructions to immediately enter an order granting summary disposition in favor of defendants.

-1-

# I INTRODUCTION

The genius of our Founding Fathers in establishing a system of three separate and co-equal branches of government was in recognizing that it is the checks and balances of such a system that serve to preserve our liberty. As I recently observed in *Slis v State of Michigan*, __ Mich App __, __; __ NW2d __ (2020) (Docket Nos. 351211, 351212), lv den ___ Mich ___; 948 NW2d 82 (2020) (BOONSTRA, J., concurring), that preservation of liberty "is why legislatures enact laws, and why it is up to the executive to sign them (or not). And it is why the judiciary defers to the legislature on matters of public policy." Without question, such a system creates certain inefficiencies in government. After all, it would be much easier if a benevolent dictator could simply rule by decree without having to endure the inconvenience of others' input. But those inefficiencies are there by design; they are the natural and intended consequence of our system of checks and balances. And those inefficiencies are therefore the price we willingly pay so that we may live under the banner of freedom in the United States of America.

The tensions between the branches of government and have existed since our nation's founding, and the relative power of any given branch has ebbed and flowed over time. Sometimes it is the executive branch that engages in governmental overreach. See, e.g., *Slis*, __ Mich App at __, slip op at 23 (lead opinion) (affirming preliminary injunction of emergency rules banning the sale of flavored nicotine vapor products) and __, slip op at 32 (BOONSTRA, J., concurring) ("As the adage goes, 'give them an inch and they'll take a mile.' Amidst the COVID-19 pandemic, that adage has new meaning. It even applies to vaping."). And sometimes the legislature is perhaps unwittingly complicit in executive overreach. See *In re Certified Questions from the United States District Court, Western District of Michigan, Southern Division*, __ Mich __, __; __ NW2d __ (2020) (issued October 2, 2020, Docket No. 161492) (holding that the Emergency Powers of the Governor Act of 1945, MCL 10.31 et seq., "is an unlawful delegation of legislative power to the executive branch in violation of the Michigan Constitution," and accordingly that "the executive orders issued by the Governor in response to the COVID-19 pandemic now lack any basis under Michigan law").

Alexander Hamilton once said that the judicial branch of government, lacking "influence over either the sword or the purse," was "the weakest of the three" branches of government. *Federalist 78*. He continued:

> [T]hough individual oppression may now and then proceed from the courts of justice, the general liberty of the people can never be endangered from that quarter; I mean so long as the judiciary remains truly distinct from both the legislature and the Executive. For I agree, that "there is no liberty, if the power of judging be not separated from the legislative and executive powers." And it proves, in the last place, that as liberty can have nothing to fear from the judiciary alone, but would have everything to fear from its union with either of the other departments . . .." [*Id*.]

But in recent years (or decades), the judicial branch has often also overreached. Too often, those who have been unsuccessful in advancing their political agenda through the political process, i.e., through the legislative and executive branches, have turned to the judiciary to achieve their political ends. And too often they have found judges who are induced, under the cloak of a robe,

to impose policy preferences by judicial fiat. But policymaking under the guise of judicial decision-making is simply tyranny by another name. See *Morrison*, 487 US at 712 (SCALIA, J., dissenting) (stating that judicial forays into policymaking result in a government that is "not only not the government of laws that the Constitution established; it's not a government of laws at all."). Courts are not mini-legislatures and judges are not policymakers. See, e.g., *Kyser v Township*, 486 Mich 514, 536; 786 NW2d 543 (2010) (noting that "policy-making is at the core of the legislative function"); *Myers v Portage*, 304 Mich App 637, 644; 848 NW2d 200 (2014) ("[M]aking public policy is the province of the Legislature, not the courts."); see also *Morrison v Olson*, 487 US 654, 697; 108 S Ct 2597; 101 L Ed 2d 569 (1988) (Scalia, J., dissenting), quoting Part the First, art XXXX, Massachusetts Const 1780 ("In the government of this Commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: The executive shall never exercise the legislative and judicial powers, or either of them: The judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men.").

## II. PROCEDURAL BACKGROUND
### A. LEAGUE OF WOMEN VOTERS

Recently, in a sister case to this one, this Court considered a complaint for mandamus, in which the plaintiffs[1] alleged that the statutory requirement that absentee ballots be received by the local election clerk by 8 p.m. on election day[2] (the ballot receipt deadline) violated Const. 1963, art. 2, § 4, as amended by the passage of Proposal 3[3] in November 2018. See *League of Women Voters of Mich v Secretary of State (League II)*,[4] ___ Mich App ___ (2020) (Docket No. 353654), lv den ___ Mich ___; 946 NW2d 307 (2020), recon den ___ Mich ___; 948 NW2d 70 (2020).

I note that while the complaint in *League II* did make brief reference to the ballot receipt deadline as "facially den[ying] voters their express constitutional right 'to choose' to submit their absentee ballots 'by mail' at any time within 40 days of election day," that complaint also cited the COVID-19 pandemic as the reason why expedited relief was necessary. It stated:

---

[1] The plaintiffs in that case were the League of Women Voters of Michigan and three individuals who were League members and registered Michigan voters.

[2] This requirement is set forth in MCL 168.764a; MCL 168.764b.

[3] See Proposition No. 18-3 (2018). Proposal 3 granted all Michigan votes the constitutional right to vote by absentee ballot without stating a reason. Before the passage of Proposal 3, the right was a statutory one, provided that certain conditions were met. Specifically, before the passage of Proposal 3 and the subsequent enactment of 2018 PA 603, MCL 168.759 provided six grounds for requesting an absentee ballot: (1) being absent from the community on election day; (2) being physically unable to attend the polls without the assistance of another; (3) because of the tenets of the voter's religion; (4) serving as an election inspector in a different precinct; (5) being 60 years of age or older; or (6) being confined to jail awaiting arraignment or trial.

[4] I use the "*League II*" nomenclature for purposes of consistency with the opinion of the Court. The parties and the Court of Claims sometimes refer to that decision as "*LWV*."

Even before COVID-19 struck Michigan, voting by mail was set to play an unprecedented role in this year's elections, and its role will be magnified exponentially given the personal and public health risks of voting in person at a polling place. Michigan's absentee ballot voting process is simply not ready to meet its biggest test ever in the 2020 primary and general elections, when Michigan voters by the millions will attempt to vote by absentee ballot. This Complaint is an action for mandamus to compel the Secretary of State to perform her clear state constitutional duties in the administration of absentee ballot voting in Michigan, to protect the fundamental rights of the Plaintiffs and over 7 million Michigan voters.

This Court in *League II* denied the complaint for mandamus, notwithstanding the fact that the defendant Secretary of State concurred with plaintiffs that the ballot receipt deadline was unconstitutional. *League II*, __ Mich App at __, slip op at 13. Our Supreme Court denied leave to appeal, and denied reconsideration of that denial, with Justice VIVIANO observing that "this lawsuit appears to be a friendly scrimmage brought to obtain a binding result that both sides desire. Nearly from the start, the defendant Secretary of State has agreed with plaintiffs that the deadline must be struck down as unconstitutional." *League II*, __ Mich at __; 948 NW2d at 70 (VIVIANO, J., concurring) (footnote omitted). He further observed, "This is not the way the judiciary works. In our adversary system, the parties' competing interests lead to arguments that sharpen the issues so that courts will 'not sit as self-directed boards of legal inquiry and research . . . .' " *Id.* at __; 948 NW2d at 71 (citations omitted).

## B. PROCEEDINGS IN THE COURT OF CLAIMS

Although we briefly outline the procedural history of this case in the opinion of the Court, it is worthy of some further explication here because, in my judgment, a full description of the manner in which this case proceeded in the Court of Claims serves to highlight my concerns about judicial overreach. In doing so, I reserve judgment about how that overreach occurred, reiterate my great respect for all concerned, and cast aspersions on no one; my focus instead is on how and why the process did not in my judgment serve us or our judicial system well.

On June 2, 2020, i.e., 11 days after *League II* was filed in this Court but before *League II* was decided, plaintiffs filed this action in the Court of Claims, seeking injunctive and declaratory relief, again claiming (as was claimed in *League II*) that the ballot receipt deadline was unconstitutional, and additionally claiming that aspects of MCL 168.932(f) (the ballot-handling restrictions) were unconstitutional.[5] Like the complaint for mandamus in *League II*, plaintiffs'

---

[5] In pertinent part, MCL 168.932(f) prohibits persons from attempting to influence how an absent vote should vote, and limits those third persons who may return an absent voter ballot to mail carriers and "member[s] of the immediate family of the absent voter including father-in-law-, mother-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law, grandparent, or grandchild, or a person residing in the absent voter's household." *Id.* The reason for enacting these ballot-handling restrictions was described by the House Legislative Analysis Section in its

complaint in this case expressed concerns about the impact upon voting of COVID-19:

> Even in ordinary times, it would be reasonable to expect the shift toward absentee voting to continue in Michigan. But these are not ordinary times. Over the past few months, life in the United States has changed rapidly as the result of a highly infectious, novel coronavirus, which as of the date of this filing, has infected over 1.85 million and killed over 107,000 people across the country. The pandemic has hit Michigan particularly hard, infecting Michiganders from Detroit to the Upper Peninsula. To date, there have been over 57,500 confirmed cases of coronavirus in Michigan, and over 5,500 deaths from the respiratory illness it causes, COVID-19.

Plaintiffs original complaint in this case did not specifically characterize its claims as presenting "facial" or "as-applied" constitutional challenges. But it did state:

> The ballot receipt deadline thus, *on its face*, denies voters their self-executing right "to choose" to submit their absentee ballots "by mail" at any time within 40 days of Election Day. (emphasis added).

Moreover, it argued that "In the face of the continuing pandemic, Michigan must take steps now to protect the fundamental voting rights of *all Michiganders*." (emphasis added). Further, it claimed, "With the primary and general elections fast approaching, the time to act is now, to prevent *widespread disenfranchisement* and effectuate the will of the voters so that *all* will have a safe and meaningful opportunity to participate in Michigan's elections." (Emphasis added). It continued, "Flatly rejecting *all* absentee ballots that arrive after 8 p.m. on Election Day, *disenfranchises Michigan voters*-many of whom also lack reasonable access to safe, in-person voting options during the pandemic-for reasons entirely beyond their control." (Emphasis added).

On June 15, 2020, and notwithstanding that plaintiffs had not yet filed a motion for preliminary injunction,[6] the Court of Claims issued an order directing defendants to file a "reply

---

analysis of HB 4242 of 1995 (which ultimately was adopted as PA 1995, No 261 and codified as MCL 168.932(f)), as follows:

> Election officials say the current system is subject to abuse by campaign workers eager to "assist" voters. Without strict limits on who can handle absentee ballots, it is difficult to track their safe return and it is difficult to enforce laws against soliciting the return of absentee ballots, coercion and intimidation in filling out ballots, and tampering. Election officials have recommended stricter control over who can handle an absentee ballot and stiffer penalties for violations as a means of enhancing the integrity of the process. [See House Legislative Analysis, HB 4242 (issued October 17, 1995), p 1.]

[6] MCR 3.310(A)(1) provides that "[e]xcept as otherwise provided by statute or these rules, an injunction may not be granted before a hearing on a motion for a preliminary injunction or on an order to show cause why a preliminary injunction should not be issued." MCR 3.310(A)(3) provides that "[a] motion for a preliminary injunction must be filed and noticed for hearing in

brief" to plaintiffs' complaint[7] by June 18, 2020, and scheduling a "hearing for the Preliminary Injunction" to occur on June 22, 2020.[8] The Court of Claims denied motions to intervene filed by the Michigan House of Representatives and the Michigan Senate (collectively, the Legislature), and by the Republican National Committee and Michigan Republican Party, but granted them amici status.[9] It then held oral argument on plaintiffs' injunctive relief request on July 8, 2020. It did so despite defendants'[10] expressed confusion in light of the fact that plaintiffs had not yet filed a motion for injunctive relief (and instead had only filed a complaint that included a prayer for such relief).[11]

On July 14, 2020, this Court issued its opinion in *League II*, and the Court of Claims therefore ordered the parties to file supplemental briefs "in light of the release of" that decision. In their supplemental brief, defendants argued that "the *LWV* decision forecloses granting injunctive relief here on the duplicate claims," and that "based on the *LWV* decisions, only Plaintiffs' request for injunctive relief regarding the absent voter ballot delivery statutes appears to be a live issue before the Court." The Legislature concurred in that assessment. Plaintiffs, however, argued for the first time that *League II* presented purely a "facial" constitutional challenge, whereas plaintiffs in this case were presenting both "facial" and "as-applied" constitutional challenges.

On August 8, 2020, the Court of Claims issued an order that mistakenly referred to a pending "Motion for Preliminary Injunction," and then stated, "The plaintiffs have raised both a facial and as applied challenge to several election statutes." It suggested that the experience of the just-completed August 2020 primary election "may or may not affect the nature of the as-applied

---

compliance with the rules governing other motions unless the court orders otherwise on a showing of good cause."

[7] Upon the filing of a complaint, a defendant generally is obliged to file either an answer to the complaint, MCR 2.110, or a motion for summary disposition, MCR 2.116. The Michigan Court Rules do not provide for the filing of a brief in response to a complaint.

[8] On June 19, 2020, the Court of Claims rescheduled the hearing for July 8, 2020, and ordered that plaintiffs file a brief by June 26, 2020, and that defendants file a response brief by July 3, 2020.

[9] The Legislature filed a motion for reconsideration of the Court of Claims' denial of their motion to intervene. The Court of Claims denied the motion for reconsideration. The Republican National Committee and the Michigan Republican Party filed an application for leave to appeal the Court of Claims' denial of their motion to intervene. This Court denied that motion. Our Supreme Court denied a further application for leave to appeal to that Court; a motion for reconsideration is now pending.

[10] Named as defendants were the Secretary of State and Attorney General of Michigan.

[11] Indeed, defendants contended that plaintiffs were not entitled to preliminary injunctive relief in part because they had yet moved for such relief. They also argued that plaintiff's request for preliminary injunctive relief should be denied on the merits.

arguments," and invited the parties to "augment their pleadings."[12]

Plaintiffs then filed an amended complaint that for the first time expressly alleged (as their original complaint had not) that they were presenting both facial and as-applied constitutional challenges. Plaintiffs contemporaneously filed a "Renewed Motion for Preliminary Injunction" (which, given the lack of any prior motion, apparently served to supplement the prior prayer for injunctive relief contained in plaintiffs' complaint), as well as a supplemental brief in support of their request for preliminary injunction, now arguing that the ballot receipt deadline was unconstitutional "as applied to the upcoming November 3, 2020 election." In response, defendants observed that "*[i]n response to the Court's suggestion in its order*, Plaintiffs' Amended Complaint makes clear that Plaintiffs are alleging facial and 'as-applied to the November election' claims." (emphasis added). Defendants nonetheless argued that this Court's ruling in *League II* "precludes Plaintiffs' facial and as-applied arguments under article 2, § 4." Further, they stated:

> Plaintiffs' as-applied claims appear to be indistinguishable from the facial claim raised in *LWV*. The facial challenge rejected by the *LWV* Court was also based on different treatment in mail service for voters. If the Court determines that to be the case, it would mean that Plaintiffs' as-applied claims are likewise precluded by the decision in *LWV*.[13]

On August 31, 2020, defendants filed a motion for summary disposition. Other than by a generic incorporation of the arguments of the above-mentioned brief, they did not in any fashion address the constitutionality of the ballot receipt deadline. They argued that the ballot-handling restrictions were constitutional. Plaintiffs filed a cross-motion for summary disposition- on both issues.

On September 18, 2020, the Court of Claims issued an opinion and order that described our holding in *League II* as addressing a "facial" constitutional challenge and as conclusively resolving plaintiffs' facial challenge to the ballot receipt deadline. Consistent with plaintiffs' newly-taken position (as well as defendants' own invitation in their preliminary injunction briefing), the Court of Claims then construed plaintiffs' challenge to the ballot receipt deadline in this case as an "as-applied" challenge, and held that "the ballot receipt deadline is unconstitutional as-applied in light of the ongoing COVID-19 pandemic." The Court of Claims further held that ballot-handling restrictions of MCL 168.932(f) "create[] an unnecessary burden that tends to unduly restrict the rights enshrined in art 2, §4," that the statute therefore was "unconstitutional as applied" to the several days preceding election day, and that during that time an absentee voter must be allowed "to seek assistance from a third party of their choosing." The Court of Claims issued a preliminary injunction accordingly.

On September 21, 2020, the Legislature filed an emergency renewed motion to intervene,

---

[12] I note that defendants had not yet answered plaintiffs' complaint and therefore had not yet filed any "pleadings." MCR 2.110(A).

[13] Yet, defendants did an about-face in the concluding paragraph of their brief, there requesting that the Court of Claims "consider granting [preliminary injunctive] relief as to the absent voter ballot receipt deadline statutes if not precluded from doing by the Court's decision in *LWV*."

to enable them to file an interlocutory appeal of the Court of Claims' preliminary injunction order. On September 28, 2020, plaintiffs filed a brief opposing that motion, and defendants, noting that they had decided not to appeal the Court of Claims' preliminary injunction order, concurred in the renewed motion to intervene.

On September 25, 2020, defendants responded to plaintiffs' motion for summary disposition, and requested, in light of the likelihood of an appeal of the Court of Claims' preliminary injunction order or its order denying intervention, that the Court of Claims hold the parties' motions for summary disposition in abeyance until any such appeal is resolved;[14] alternatively, they requested the denial of plaintiffs' motion for summary disposition.

On September 30, 2020, the Court of Claims issued an opinion and order that incorporated the reasoning of its September 18, 2020 preliminary injunction opinion and order. Holding that "as applied under the current circumstances and on the record before this Court, the ballot receipt deadline and the voter assistance ban violate art 2, § 4," the Court of Claims granted summary disposition in favor of plaintiffs as to both the ballot receipt deadline and the ballot-handling restrictions, effectively granting a permanent injunction. It also granted the Legislature's renewed motion to intervene. This appeal then ensued.

## III.  ANALYSIS

I agree entirely with the opinion of the Court that plaintiffs raise a facial, not an as-applied, constitutional challenge in this case. I will not repeat the rationale (with which I concur), but would instead additionally observe that in the face of an adverse decision on the constitutional issue raised in *League II* with respect to the ballot receipt deadline, plaintiffs in this case embarked on a creative effort to dodge the effect of that decision, and took advantage of proceedings that featured:

- Expedited briefing on a "motion" that had never been filed

- Oral argument on a "motion" that had never been filed

- A reframing of plaintiffs' arguments to sidestep the adverse decision in *League II*

- The "augmentation" of plaintiffs' complaint to conform to those reframed arguments

- Errors on the merits as described in the opinion of the Court

To quote Justice VIVIANO, "This is not the way the judiciary works." *League II*, __ Mich

---

[14] I note that appeals of preliminary injunction orders or orders denying intervention, which are not "final orders," may proceed only upon the granting of an application for leave to appeal, whereas an appeal from an order granting summary disposition may proceed by right. MCR 7.202; MCR 7.203.

at __ (VIVIANO, J., concurring).  The judiciary's role is to decide actual controversies.  Particularly in an era of excessive politicization, the judiciary should not be hijacked to achieve political ends outside of the legislative process.  And the judiciary, which cannot "function both as an advocate and as an adjudicator," *In re Knight*, __ Mich App __, ___; ___ NW2d ___ (2020) (Docket No. 346554), slip op at 3, should not allow itself to be hijacked.  The constitution is not suspended or transformed even in times of a pandemic, and judges do not somehow become authorized in a pandemic to rewrite statutes or to displace the decisions made by the policymaking branches of government.

## IV.  COROLLARY

Because this matter has been expedited and time is of the essence, circumstances do not permit us to fully examine the question of whether plaintiffs have standing to bring this action for injunctive and declaratory relief.[15]  We consequently have properly assumed for purposes of our decision that plaintiffs do have standing.  I believe, however, that the question is a significant one, and that, if circumstances permitted us to fully examine the question, it might lead to the conclusion that plaintiffs lack standing.  And I believe that conclusion may follow from our conclusion that plaintiffs' constitutional challenge is a facial one.

Our Supreme Court has held that "[w]here a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing.  A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant." *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 372; 792 N.W.2d 686 (2010).  The statutory scheme here does not imply that the Legislature intended to confer standing on plaintiffs.  The pertinent question, therefore, is whether plaintiffs have a "special injury or right, or substantial interest, that will be detrimentally affected in a manner *different from the citizenry at large*."  *Id*. (emphasis added).

It seems to me that, in bringing a facial challenge, it could plausibly be argued that plaintiffs necessarily are not asserting a "special injury or right, or substantial interest, that will be detrimentally affected in a manner *different from the citizenry at large*."  Rather, they are asserting the *same* injury, right, or interest as that of the citizenry at large—being subject to a law that is incapable of any valid, constitutional application.  See *Steffel v Thompson*, 415 US 452, 474; 94 S Ct 1209; 39 L Ed 2d 505 (1974).  In that event, absent some exception, plaintiffs would not have standing.  An exception to the standing requirement has been recognized for certain forms of vagueness and overbreadth challenges in the context of the regulation of free speech, see, e.g., *Michigan Up & Out of Poverty Now Coalition v State of Michigan*, 210 Mich App 162, 170; 533 NW2d 339 (1995).  But here, although Count IV of plaintiffs' complaint does allege a violation of the right to free speech under Const 1963, art 1, § 5, plaintiffs have not alleged that the challenged statutes "sweep too broadly, covering a substantial amount of protected free speech," or that they

---

[15] The parties have not raised or addressed this issue on appeal.  The Republican National Committee and the Michigan Republican Party do argue in their amicus brief that plaintiffs lack standing, although their argument does not track what I outline here.

create an "unreasonable risk of censorship by vesting "unbridled discretion in a government official over whether to permit or deny expressive activity." *Id.*, citing *Lakewood v Plain Dealer Publishing Co*, 486 US 750, 755-756; 108 S Ct 2138; 100 L Ed 2d 771 (1988). And if plaintiffs have not adequately alleged an exception to the standing requirement, then they would not seem to have standing to bring this action in its current form.

That would not mean, however, that plaintiffs (or anyone else in the citizenry at large) would have no recourse. This Court has held:

> Michigan jurisprudence recognizes the special nature of election cases and the standing of ordinary citizens to enforce the law in election cases. *Deleeuw v Bd of State Canvassers*, 263 Mich App 497, 505–506; 688 NW2d 847 (2004). See also *Helmkamp v Livonia City Council*, 160 Mich App 442, 445; 408 NW2d 470 (1987) ("[I]n the absence of a statute to the contrary, . . . a private person . . . *may enforce by mandamus* a public right or duty relating to elections without showing a special interest distinct from the interest of the public." [Quotation marks omitted.]). The general interest of ordinary citizens to enforce the law in election cases is sufficient to confer standing *to seek mandamus relief.* See *Citizens Protecting Michigan's Constitution*, 280 Mich App at 282; 761 NW2d 210 (permitting a ballot question committee to challenge a petition). [*Protect MI Constitution v Secretary of State*, 297 Mich App 553, 566-567; 824 NW2d 299 (2012), rev'd on other gds, 492 Mich 860 (2012) (emphasis added).]

See also *League II*, __ Mich App at __ , slip op at 2, citing *Citizens Protecting Michigan's Constitution v. Secretary of State*, 324 Mich App 561, 583; 922 NW2d 404 (2018), aff'd 503 Mich 42; 921 NW2d 247 (2018) (" '[M]andamus is the proper remedy for a party seeking to compel election officials to carry out their duties.' ").

In other words, the plaintiffs in *League II* pursued the proper remedy in an election case, i.e., mandamus. Plaintiffs in this case did not seek mandamus. As a result, they may lack standing. Nonetheless, because the circumstances of this appeal do not permit our full consideration of the standing issue, and the parties have not developed the arguments on appeal, it is not properly before us to decide at this juncture.

## V. CONCLUSION

For the reasons stated in the opinion of the Court and for these additional reasons, I concur in our determination to reverse the Court of Claims, to vacate its order granting summary disposition in favor of plaintiffs as well as its preliminary and permanent injunctions, and to remand with instructions to immediately enter an order granting summary disposition in favor of defendants.

/s/ Mark T. Boonstra